UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| 7-ELEVEN, INC., | : |
| Plaintiff, | : |
| v. | : Civil Action No. |
| TARIQ A. KHAN, SENITA KHAN, FAROUQ KHAN, RAJESH M. AJMERI, IRAM M. KHAN, MOHAMMED TARIQ WATTOO, ASAID SOHAIL, ANSARUL H. RANA, MOHAMMED TANVEER, FAITH E. CAMACHO, SHAHID F. KHAN, and DOES 1 through 50, inclusive, | : **COMPLAINT** |
| Defendants. | : |

---

Plaintiff 7-Eleven, Inc. ("7-Eleven"), by its attorneys, Duane Morris LLP, for its complaint in the above-entitled action, alleges, with knowledge as to its own acts, and otherwise on information and belief, as follows:

## Nature of this Action

1.      This action arises from illicit, wide-ranging schemes originated by defendant, (terminated) 7-Eleven franchisee, Tariq A. Khan ("Tariq"), and his co-conspirators, including but not limited to his "lieutenants," defendants Asaid Sohail ("Sohail"), Mohamed Tariq Wattoo ("Wattoo"), Rajesh M. Ajmeri ("Ajmeri"), Iram M. Khan ("Iram" – Tariq's son), Senita Khan ("Senita" – Tariq's

wife), the other specifically-named defendants and the defendants denominated as "DOES" (collectively, the "defendants"), to secretly, and successfully, siphon hundreds of thousands of dollars in cash from four 7-Eleven stores franchised to Tariq, and one store franchised jointly to Tariq and Senita, by various fraudulent, and unlawful, methods.

2.     In relevant part, during at least the past four (4) years, and undoubtedly for more than a decade, Tariq intentionally failed to report multiple hundreds of thousands of dollars of merchandise sales, including taxable sales, at the Stores by manipulation of the cash registers and working from "open drawers." Although Tariq masked a portion of the inventory shortages that would otherwise have resulted from the unrecorded sale of merchandise by various illicit schemes and devices, Tariq intentionally caused inventory shortages to be created artificially and, thus, falsely underreported his net income to the Federal and State governments. Tariq also failed to report to 7-Eleven all of the hours worked by his employees at certain of the Stores, in violation of Federal and State law.

3.     7-Eleven and its franchisees share in a store's gross profit.  Gross profit is the difference between net sales and the cost of goods sold.   If merchandise sales are not recorded, 7-Eleven is deprived of its share of the gross profit on the unrecorded sale.  For at least the past four (4) yeas, Tariq directed his lieutenants, managers and employees, including the defendants named in this

2

action, not to report or record certain sales so that Tariq could siphon off monies for his own use.   Under Tariq's direction and that of his lieutenants and store managers, a significant portion of the transactions in each of the Stores was not reported.   The clerks and managers would either bypass entirely the point of sale ("POS") cash registers or use certain cash register keys such as grocery non-tax or CAV (cancel age verification), the latter of which is legitimately used to cancel out the sale of age-restricted products, such as beer and cigarettes, but which was used at the franchised Stores to cancel out actual sales of such products while pocketing cash from such sales.

4.     As hereinbelow alleged (paragraphs 83-106), 7-Eleven has amassed hard evidence, including videotaped transactions at the Stores, both recently and historically, as well as irrefutable statistical data which establish the intentional diversion of cash from the operation of the Stores.   The diverted cash was used to purchase merchandise inventory from various suppliers, the invoices for which were never reported to 7-Eleven as required by the franchise agreements.   In essence, Tariq operated a business within a business in each of the Stores.   The diverted cash was also used to pay managers and employees in cash, thus avoiding payment of payroll taxes, including withholding taxes.   The balance of the cash was simply put into Tariq's pocket.

5.     Tariq's schemes were active at all four stores franchised to Tariq and in the one store franchised jointly to Tariq and Senita.  The unreported funds were put in the safe or a locked drawer in the office at each of the Stores on a daily basis.  Tariq closely monitored the activities of the Stores through his personal involvement and through his trusted lieutenants.

6.     Although Tariq and Senita are sometimes referred to in the present tense as current franchisees, on June 21, 2013, 7-Eleven terminated forthwith the four Store Franchise Agreements franchised to Tariq in his individual capacity and the one Store Franchise Agreement franchised jointly to Tariq and Senita, each without opportunity to cure as a consequence of the egregious breaches of the Store Franchise Agreements committed by Tariq and Senita.

7.     The foregoing schemes involved hundreds of thousands of dollars in diverted merchandise inventory and diverted and unreported cash. Notwithstanding the forthwith termination of the five Store Franchise Agreements, the former franchisees refused to vacate and surrender their formerly franchised 7-Eleven stores to 7-Eleven.   Such defendants also continue to use 7-Eleven's tradenames, trademarks, service marks and trade dress.  In consequence of such refusal to vacate and surrender their formerly franchised 7-Eleven stores, this complaint seeks relief with respect to such defendants' unauthorized use of 7-

4

Eleven's tradenames, trademarks, service marks and trade dress under Section 43(a) of the Lanham Act.

8.     Moreover, as detailed herein, defendants' activities also give rise to claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.,* and multiple common law claims, including fraud, breach of contract, mandatory injunctive relief and recovery of chattels.  7-Eleven also seeks a declaration with respect to Tariq and Senita that their material breaches of contract, which go to the core of their franchise relationship with 7-Eleven, entitled 7-Eleven to forthwith terminate the five Store Franchise Agreements without providing such individuals a right to "cure" their blatant dishonesty.

## Jurisdiction and Venue

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. § 1332 (diversity), 18 U.S.C. § 1964(c) (RICO), 15 U.S.C. §§ 1121 and 1338(a) (Lanham Act), and under principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1965 because the defendants reside in this judicial district, and a substantial part of the events out of which 7-Eleven's claims arise occurred in the Eastern District of New York.

11.   The amount in controversy on each of the counts set forth below exceeds $75,000 exclusive of interest and costs.

## The Parties and the Franchise Agreements

12.   7-Eleven is a Texas corporation.  It maintains a place of business at 115 Broadhollow Road, Melville, New York 11749.  It is a citizen of the State of Texas.

13.   7-Eleven is the premier name and largest chain in the convenience store retailing industry.

14.   Tariq, an individual, is a citizen of the State of New York, residing at 1345 Pond Lane, Hewlett, New York 11557.

15.   Senita, an individual, is a citizen of the State of New York, residing at 1345 Pond Lane, Hewlett, New York 11557.

16.   Tariq entered into a 7-Eleven Store Franchise Agreement effective June 1, 2004 (the "Brooklyn Avenue Franchise Agreement"), which agreement superseded a franchise agreement effective September 3, 1992, pursuant to which, inter alia, 7-Eleven leased or subleased to Tariq certain equipment and real property presently described as 7-Eleven Store No. 2422-11159E located at 80 Brooklyn Avenue, Freeport, New York 11520 (the "Brooklyn Avenue" store). Reference is made to the Brooklyn Avenue Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

17.    Tariq entered into a 7-Eleven Store Franchise Agreement effective June 1, 2004 (the "Atlantic Avenue Franchise Agreement"), which agreement superseded a franchise agreement effective January 19, 1989, pursuant to which, inter alia, 7-Eleven leased or subleased to Tariq certain equipment and real property presently described as 7-Eleven Store No. 2422-11179G located at 169 Atlantic Avenue, Lynbrook, New York 11563 (the "Atlantic Avenue" store). Reference is made to the Atlantic Avenue Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

18.    Tariq entered into a 7-Eleven Store Franchise Agreement effective January 3, 2002 (the "Merrick Road Franchise Agreement"), pursuant to which, inter alia, 7-Eleven leased or subleased to Tariq certain equipment and real property presently described as 7-Eleven Store No. 2422-23407E located at 324 Merrick Road, Rockville Centre, New York 11570 (the "Merrick Road" store). Reference is made to the Merrick Road Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

19.    Tariq entered into a 7-Eleven Store Franchise Agreement effective June 1, 2004 (the "Hempstead Turnpike Franchise Agreement"), which agreement superseded a franchise agreement effective February 28, 1991 pursuant to which, inter alia, 7-Eleven leased or subleased to Tariq certain equipment and real property presently described as 7-Eleven Store No. 2422-24568E located at 1571

7

Hempstead Turnpike, Elmont, New York 11003 (the "Hempstead Turnpike" store).   Reference is made to the Hempstead Turnpike Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

20.   Tariq and Senita entered into a 7-Eleven Store Franchise Agreement effective March 26, 1999 (the "Sunrise Highway Franchise Agreement"), pursuant to which, inter alia, 7-Eleven leased or subleased to Tariq and Senita certain equipment and real property presently described as 7-Eleven Store No. 2422-32371A located at 145 Sunrise Highway, Freeport, New York 11520 (the "Sunrise Highway" store).   Reference is made to the Sunrise Highway Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

21.   The Brooklyn Avenue store, the Atlantic Avenue store, the Merrick Road store, the Hempstead Turnpike store and the Sunrise Highway store are sometimes hereinafter collectively referred to as the "Stores" or the "Premises." The Brooklyn Avenue Franchise Agreement, the Atlantic Avenue Franchise Agreement, the Merrick Road Franchise Agreement, the Hempstead Turnpike Franchise Agreement and the Sunrise Highway Franchise Agreement are sometimes collectively referred to as the "Franchise Agreements."

22.     Farouq Khan ("Farouq"), an individual, is a citizen of the State of New York, residing at 142 Belmont Blvd., Elmont, New York 11003.  Farouq is the brother of Senita and, at times relevant to this action, managed one or more of the Stores, including the Brooklyn Avenue Store.

23.     Ajmeri, an individual, is a citizen of the State of New York, residing at 201 Wilton Street, New Hyde Park, New York 11040.  Rajesh has been employed by, and/or affiliated with, Tariq for in excess of ten (10) years and, at times relevant to this action, managed one or more of the Stores, including the Sunrise Highway Store.

24.     Iram, an individual, is a citizen of the State of New York, residing at 1345 Pond Lane, Hewlett, New York 11557.  Iram is the son of Tariq and Senita.  At times presently unknown, but from time-to-time during the period of from in or about January 2011 to the present date, Iram exercised authority over the operation of one or more of the Stores, reporting directly to Tariq.

25.     Wattoo, an individual, is a citizen of the State of New York, residing at 2775 East 12th Street, Brooklyn, New York 11235.  Commencing in October 2002 until at least in or about March or April 2013, Wattoo was employed by Tariq and given overall responsibility, during the substantial majority of his tenure, for the ordering of merchandise inventory for the Stores, including the illicit, unreported cash purchases described herein.

9

26.    Sohail, an individual, is a citizen of the State of New York, residing at 27 Hinsdale Avenue, Floral Park, NY 11001.  Sohail has been employed by Tariq since February 2011 and, during at least the past several months, Sohail, reporting directly to Tariq, has exercised supervision over the operation of the Stores.

27.    Ansarul H. Rana ("Rana"), an individual, is a citizen of the State of New York, residing at 91-94 108th Street, Richmond Hill, New York 11418. Commencing in June 2010, Rana has been employed by Tariq as a sales associate and has participated in the fraudulent transactions described herein.

28.    Faith E. Camacho ("Camacho'), an individual, is a citizen of the State of New York, residing at 13401 Rockaway Blvd., South Ozone Park 11420. Commencing in May 2008, Camacho has been employed by Tariq as a sales associate and has participated in the fraudulent transactions described herein.

29.    Mohammed Tanveer ("Tanveer"), an individual, is a citizen of the State of New York, residing at 8623 Musket Street, Queens Village, New York 11427.  Commencing at a time presently unknown, but during at least the past six months, Tanveer has been employed by Tariq as a sales associate and has participated in the fraudulent transactions described herein.

30.    Shahid F. Khan ("Shahid"), an individual, is a citizen of the State of New York, residing at 142 Belmont Blvd., Elmont, New York 11003.

Commencing at a time presently unknown, Shahid has worked as a sales associate and has participated in the fraudulent transactions described herein.

31.   7-Eleven is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names.  7-Eleven will amend complaint to allege their true names and capacities when ascertained.  7-Eleven is informed and believes and thereon alleges that each of the fictitiously-named defendants aided, abetted and/or materially assisted Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail in the wrongdoing alleged herein.

32.   Each of Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail reaped substantial, albeit undisclosed, profits from their ownership and/or management of, and/or affiliation with, the franchises described herein and each of them directed one or more of the fraudulent communications described herein.

33.   7-Eleven is informed and believes and thereon alleges that each of the defendants, including the defendants named as DOES, sued herein at all times were and are co-conspirators, agents, members, servants, employees, joint venturers, partners, alter egos, single enterprise, subsidiaries and/or subcontractors of the other defendants, and were and are acting within the course and scope of their conspiracy, membership, agency, office, employ, and with the permission, consent, authorization and ratification and/or at the direction of the other

11

defendants, and for this reason as well as for other reasons yet unknown, are jointly and severally liable for each and every aspect of 7-Eleven's damages as more fully specifically set forth below.

## Facts Common to All Counts

### 7-Eleven and the 7-Eleven System

34.     Based in Dallas, Texas, 7-Eleven operates, franchises or licenses more than 9,700 7-Eleven stores in North America.

35.     In the 48 contiguous states, 7-Eleven is divided into various Zones, each of which has discrete territories designated by 7-Eleven as Markets.  Each of the Stores is located in what is known as Market 2422 in 7-Eleven's North Atlantic Zone.  Virtually all of the stores in Market 2422, including the Stores, are located in Nassau County.

36.     Through its franchise system, 7-Eleven markets, promotes, and provides products and services to its customers throughout the United States.  In order to identify its stores, products and services, 7-Eleven allows its franchisees to utilize the 7-Eleven trademarks and trade names in connection with the operation, advertising and identification of the convenience store.

37.     As part of the franchise agreement, 7-Eleven requires, and the franchise agreement for each store provides for, accounting systems and controls that are designed to provide accountability for the operation of the store, as well as

12

to determine and account for the "equity" position of the franchisee, i.e., the franchisee's net worth in the store's operations, which the franchisee is obligated to maintain above a certain minimum level.

38.    In the case of a traditional franchised 7-Eleven store, such as the Stores, 7-Eleven selects the location of each store, purchases the land and constructs the store, or leases an appropriate structure, and prepares the store for operation, including providing all equipment (shelves, counters, cash registers, lighting and other fixtures, heating and cooling equipment, signs, parking lot preparation, etc.) necessary for its operation.   In essence, 7-Eleven presents a franchisee with a complete "turn-key" physical plant ready for retail operation.

39.    In the case of a traditional franchised 7-Eleven store, under the current, and prior forms of, franchise agreement, a franchisee is leased the store and equipment, and is licensed to use the 7-Eleven® Service Mark, related trademarks, trade dress and system of operations (collectively, the "Trademarks"). In such arrangement, a franchisee does not acquire ownership of the store, its premises or any of the physical plant, all of which remain the property of 7-Eleven. Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations, which the franchisee draws against on a weekly basis.

40.    In a traditional franchised operation, applicable to the Stores, 7-Eleven's essential financial interest is in receiving a percentage of the "gross profit" (net sales less cost of goods sold) derived from operation of the store, which percentage (usually between 50 and 52 percent) is designated in the franchise agreement as the "7-Eleven Charge."   In a traditional franchised 7-Eleven store, the net income in which the franchisee has an interest is the amount remaining after deducting both "operating expenses" (such as payroll and similar expenses) and the 7-Eleven Charge from the gross profit.   In such arrangement, operating expenses do not include certain store repairs, replacement of equipment, insurance, real property taxes, any rental charge, electricity, heat or other utility costs, all of which are borne by 7-Eleven.

**Financing Offered by 7-Eleven to the Franchisee: The Open Account**

41.    In addition to furnishing the store and equipment to the franchisee, 7-Eleven has the right to provide bookkeeping services for the store.  If a franchisee requests, 7-Eleven will also provide financing for the operation of the store, pursuant to the terms of the franchise agreement.  Although most franchisees, like Tariq and Senita, utilize 7-Eleven's financing, they are free to obtain their own financing for the operation of the store.

42.    In order to secure the financing that 7-Eleven provides to the franchisee, 7-Eleven is given a security interest in, among other things, all of the

14

present and thereafter acquired store inventory, and the proceeds thereof. Each 7-Eleven franchisee executes a security agreement ("Security Agreement") as a part of and supplementing the franchise agreement.

43.    The franchisee is responsible for purchasing the initial inventory for the store and for all subsequent inventory purchases. However, the franchisee may make its initial inventory purchase by paying only part of the purchase price and using 7-Eleven's financing to pay the balance. The amount financed by 7-Eleven and the balance due from the franchisee is maintained in an account defined in the franchise agreement as the "Open Account." The Open Account reflects any initial inventory financed, and all subsequent purchases and expenses (that are financed by the franchisee through 7-Eleven), as well as revenues, flow through the Open Account. Essentially, the Open Account is a running working capital account that at any particular point in time reflects the outstanding balance of any unpaid sums that 7-Eleven has loaned or advanced to the franchisee to operate the store.

**Franchisee's Reporting Obligations at the Heart of the 7-Eleven System**

44.    After operation of a store commences, the franchisee is obligated to record accurately all monetary and financial transactions. First, the franchisee is obligated to ring up all sales made in the store, using, to the extent possible, the POS scanner, including all sales of merchandise, money orders, cigarettes, lottery tickets, and other sales. The cash register automatically maintains a running total

for all entries.   The franchisee uses the information collected from POS cash register totals for the day to prepare the daily reports a franchisee is required to make to 7-Eleven.

45.   The franchise agreement also obligates the franchisee to report all activity of the store on forms and at times specified by 7-Eleven.

## The Daily Cash Report and Daily Deposits of Receipts

46.   With respect to sales and receipts of the store, franchisees are obligated to submit a daily cash report ("Daily Cash Report") each day and make daily deposits of receipts into a designated 7-Eleven bank account.   The franchisee is required by the franchise agreement to deposit each day's cash receipts into the designated bank account no later than the following day.

47.   The Daily Cash Report indicates the amount of sales for the day as recorded or rung up on the cash register, sales made by credit card, and sales of money orders.   The Daily Cash Report also accounts for and records any deductions to or from cash that affects the daily deposit, such as manufacturers' coupons.   For example, a franchisee could record a deduction for cash received from sales that was used to pay a vendor for inventory for the store or for unanticipated or one-time labor costs that are not paid directly through 7-Eleven's payroll system.   Although the franchisee is responsible for the labor and payroll costs in the operation of the store, the franchisee's employees are paid through

16

what is effectively a "payroll service" that 7-Eleven provides to its franchisees, as part of the overall accounting services provided by 7-Eleven as contemplated by the franchise agreement.

48.     7-Eleven credits the franchisee's Open Account for the cash deposit and thereby reduces any amount owed on the Open Account.  The Daily Cash Report is prepared and electronically submitted to 7-Eleven by the franchisee (or, if desired by the franchisee, by the franchisee's employee) and is the only means used to report daily sales and account for all receipts.  It is at the heart of 7-Eleven's accounting system.  When 7-Eleven's accounting department receives the Daily Cash Report, information in it is automatically entered into 7-Eleven's computerized accounting records.

**Inventory Purchases**

49.     The franchisee does not need to use the cash receipts in the store to pay for inventory or other supplies and, in fact, few franchisees do so.  When a franchisee purchases merchandise and supplies, the franchisee is required, pursuant to the franchise agreement, to report and submit the related invoice, bill or statement to 7-Eleven for recording and for direct payment to the vendor by 7-Eleven.

50.     When 7-Eleven pays an invoice submitted by a franchisee for an inventory purchase for the store, the payment is charged to the franchisee through

the Open Account.  The balance owed by the franchisee on the Open Account is increased by the amount of the expenditure.  7-Eleven pays the related invoice, bill or statement only so long as it is willing to provide Open Account financing to the franchisee.

51.     As noted above, few franchisees use monies in the store to pay for inventory, as such practice is discouraged by 7-Eleven.   Instead, franchisees typically submit invoices for inventory purchases or, as is the more prevalent practice, the inventory vendors electronically submit invoices for purchases to be paid directly by 7-Eleven since this minimizes the paperwork required of the franchisee and it aids in the accurate and orderly accounting for the store. Alternatively, as noted above, when the franchisee pays for inventory directly to the vendor with cash from the store's receipts, the invoice, bill or statement must be submitted to 7-Eleven for verification and recording.  If the franchisee pays for the inventory in cash, it is required to be reflected on the Daily Cash Report (to account for the reduced amount of the deposit made to the store's bank account) and the related invoice, bill or statement is required to be turned in to 7-Eleven.

52.     Commencing in 2004, 7-Eleven provided in its new franchise agreements that most inventory purchases would be made by the franchisee through one of the selected preferred vendors identified by 7-Eleven.

53.    In addition, most purchases through these vendors are invoiced electronically between the vendor and 7-Eleven.  Through the electronic invoicing, the payments and charges are made directly by 7-Eleven for the franchisee and posted against the franchisee's Open Account, thereby reducing and simplifying the inventory accounting for both the franchisee and 7-Eleven.

**Inventory Recording and Accounting**

54.    7-Eleven operates what is known as a retail method of inventory accounting system.   When a 7-Eleven store commences operations, a physical count of all inventory is made and the inventory is valued "at retail," i.e., at the retail selling price of each item of inventory.   The retail selling prices are determined by the franchisee, who is required to report them to 7-Eleven for accounting purposes.   7-Eleven must rely upon the franchisee's honesty in reporting to 7-Eleven the retail selling prices.  This opening inventory is the initial balance in the retail book inventory maintained in the store's accounting records by 7-Eleven.  When a franchisee purchases merchandise for the store, the invoice is transmitted to 7-Eleven together with the value of the purchased merchandise at retail.   7-Eleven then increases retail book inventory by the retail value of the merchandise purchased.  Reported sales of merchandise to customers reduce the retail book inventory.  Sales of merchandise to customers that are not recorded do

not reduce the retail book inventory, although the actual retail inventory is, in fact, reduced.

55.     The 7-Eleven franchise system makes it absolutely mandatory that franchisees report all store activity in a timely and accurate fashion.  7-Eleven uses and relies on the reported information in a variety of ways.

    (a)    The honest reporting of sales and inventory purchases allows 7-Eleven to calculate the correct gross profit and thus the 7-Eleven Charge.

    (b)    The honest reporting of all receipts of the store, including discounts and allowances received from vendors and others, allows 7-Eleven to credit the Open Account accurately and ensure that funds are not fraudulently diverted out of the store.

    (c)    The honest reporting of store payroll expenses allows 7-Eleven to prepare each franchisee's payroll accurately and insure that all appropriate taxes are collected and paid to the government.

56.     In addition to the above, inaccurate or false reporting by franchisees also harms 7-Eleven in several ways.

    (a)    Intentional understatement of sales deprives 7-Eleven of its full share of the gross profit since the 7-Eleven Charge will be understated.

    (b)    In addition to fraudulent reporting that results in the direct understatement of a store's gross profit, and thus, has a direct monetary impact on the 7-Eleven Charge, any defalcation of sales proceeds has the same effect as if someone walked into 7-Eleven's office and stole cash from it (i.e., the cash has been misappropriated).

    (c)    Any fraudulent reporting that results in understated profits means that the equity in the store has been likewise reduced, thus reducing 7-Eleven's security interest in the store.  In other words, 7-Eleven's risk of loss of uncollected debts increases.

(d)   When 7-Eleven prepares financial summaries of franchised stores in an attempt to attract new franchisees, understated store sales and profits will make a 7-Eleven franchise look less attractive and thus more difficult to franchise.

57.   To the extent fraudulent reporting results in an understatement of taxes paid (e.g., sales tax, payroll related taxes, etc.), often times the governmental agency that has been defrauded by the franchisee attempts to collect from 7-Eleven.  7-Eleven must then incur the time and cost to defend itself.

## RIS

58.   7-Eleven utilizes a proprietary Retail Information System (RIS).  The system builds efficiencies into ordering, distribution and merchandising processes and is designed to provide timely, accurate sales information on an item-by-item basis.  RIS includes:

(i)   Touch-screen point-of-sale (POS) cash registers with scanners;

(ii)   Integration of credit-card authorization into the POS register;

(iii)   Item-level information to assist in making product-ordering decisions;

(iv)   Automation of some daily reporting requirements, such as merchandise sales; and

(v)   A payroll time-keeping mechanism.

59.   The cash registers (also referred to as the POS register system)   there are usually two in each store -- track sales by product and time of day and feed that data to a server running RIS in the back room or office, which matches the information against inventory on hand and on order.  Store managers know when

21

they are selling what, and can tailor the product mix to their clientele. The server is shared with 7-Eleven by a dedicated network.

60.    Utilizing the POS register system, merchandise purchased by a customer would be electronically scanned, its price appears on the register, the cash tendered by the customer is recorded, a register drawer opens, and the customer is given the change from his or her purchase, following which the register drawer is closed. If the POS register drawer remains open, another sales transaction cannot be recorded.

61.    The POS register system simultaneously records all transactions in the server -- commonly referred to as an electronic journal -- which, as noted, is accessible by 7-Eleven.  7-Eleven thus has the ability to view on the electronic journal every transaction recorded by store personnel.  It also has the ability to review certain categories of transactions by simply requesting the program to focus on specified transactions.

**Monthly Financial Statements Prepared by 7-Eleven**
**Based On Information Submitted by the Franchisee**
**Through the Daily Cash Report and Other Required Reports**

62.    7-Eleven prepares monthly financial statements for each store from 7-Eleven's bookkeeping records.  The information in the bookkeeping records is essentially derived from information supplied by the franchisees, particularly the

store's Daily Cash Reports and the employee time sheets submitted and used to process the franchisee's payroll.

63. The monthly financial statements include a profit and loss statement for the month and an updated balance sheet for the store, as well as comparative information from prior periods and cumulative information for the year to date.

64. Based primarily on the Daily Cash Reports submitted by the franchisee for the month, the "7-Eleven Charge," through which 7-Eleven receives its share of the Gross Profits of the store, is calculated and reflected on the monthly financial statement. The monthly financial statement also reflects the outstanding balance of the Open Account (the debt owed to 7-Eleven by the franchisee) as of the date of the report.

65. Each store is required to maintain a minimum "Net Worth," which is essentially defined in the franchise agreement as all of the "assets" (such as the cash register fund, the cost value of the inventory, store supplies, receivables, and prepaids), less the franchisee's payables and secured obligations from the operation of the store (such as accrued salaries and withholding taxes payable), including any Open Account indebtedness to 7-Eleven.

66. The franchisee may take a weekly draw so long as s/he is not in breach of the Franchise Agreement and the draw does not cause the net worth of franchisee's assets and liabilities to fall below the Net Worth minimum.

67.     The minimum Net Worth account balance provides 7-Eleven with a financial safety net with respect to each franchised 7-Eleven store.  Inasmuch as 7-Eleven, with regard to a traditional 7-Eleven franchised store, builds or leases the store premises, purchases equipment, delivers a fully operational convenience store to a franchisee from the outset of the franchise relationship, and provides ongoing financing to the franchisee for inventory purchases and other operating expenses, the minimum Net Worth requirement assures that all 7-Eleven franchisees are vested in the operation of their 7-Eleven stores and further serves as a monetary cushion for both the franchisee and 7-Eleven should a franchisee's store experience financial difficulty.

## 7-Eleven's Registered Trademarks and Service Marks

68.     Based upon years of experience, 7-Eleven has developed, and is the sole and exclusive owner of, unique and uniform systems relating to the establishment and operation of 7-Eleven high-end convenience food stores (the "7-Eleven System").

69.     The 7-Eleven System is a comprehensive business format for the establishment, operation, and development of high-standard convenience food store businesses with distinctive features in products, services, distribution, accounting, training, and management assistance.   The 7-Eleven System is designed to ensure that 7-Eleven convenience stores and the services and products

offered therein meet uniform, high quality standards. The 7-Eleven System is also designed to protect 7-Eleven's name and reputation. As such, all 7-Eleven franchise agreements require franchisees to comply with the 7-Eleven System in the operation of their 7-Eleven convenience stores.

70.    The 7-Eleven System is widely known and favorably recognized by consumers. Consumers choose 7-Eleven because of 7-Eleven's high reputation for, *inter alia*, quality and service. The 7-Eleven System is founded upon adherence to 7-Eleven's standards and specifications.

71.    To identify the source, origin and sponsorship of 7-Eleven convenience stores and the services they offer, and to distinguish those 7-Eleven convenience stores and the products and services provided therein from those established, made, offered and sold by others, 7-Eleven has extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, including, but not limited to the following names and marks (heretofore defined as the "Trademarks"):

| Mark | Registration Number | Effective Date |
|------|---------------------|----------------|
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |

H:\7-Eleven\Tariq Khan\Initial Filing\TK Complaint.docx

| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |
|---|---|---|

72.     The Trademarks are registered on the Principal Register of the United States Patent and Trademark Office.  These registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

73.     7-Eleven has given notice to the public of the registration of the Trademarks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the Trademarks.

74.     7-Eleven has continuously used the Trademarks in interstate commerce in connection with the promotion and licensing of 7-Eleven businesses and the services they offer throughout the United States, including the State of New York, since the date of their registration.

75.     7-Eleven and its authorized franchisees use the Trademarks as the marks and trade identity by which the products and services offered by 7-Eleven and its franchisees are distinguished from other convenience store businesses and the products and services offered by them.

76.     7-Eleven and its authorized franchisees have extensively advertised and promoted 7-Eleven businesses and the services they offer under the

26

Trademarks throughout the United States and through various media. As a result of such efforts and the considerable money spent in connection therewith, the services offered by 7-Eleven and its licensees under the Trademarks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including the State of New York.

**Tariq's and Senita's Obligations upon Termination of the Franchise Agreements**

77.     Each of the Franchise Agreements grants a non-exclusive right to use the Trademarks in accordance with the terms of the parties' agreement and 7-Eleven's standards and specifications. Tariq and Senita agreed that 7-Eleven shall remain the owner of the Trademarks and all goodwill associated therewith and also agreed not to interfere with 7-Eleven's rights in the Trademarks.

78.     Tariq and Senita agreed to operate the Stores in compliance with all laws and in conformance with 7-Eleven's standards and specifications.

79.     Each of the Franchise Agreements contains a lease which expressly creates a landlord-tenant relationship between 7-Eleven, on the one hand, and Tariq and/or Tariq and Senita, on the other hand.

80.     Pursuant to and as part of the Franchise Agreements, 7-Eleven leased the Premises and all equipment therein to Tariq and Senita. The Stores and equipment were and continue to be owned by 7-Eleven.

81.     Upon termination of each of the Franchise Agreements, Tariq and Senita were required to, among other things: (i) peaceably surrender the Stores and 7-Eleven Equipment; (ii) transfer to 7-Eleven the final inventory of the Stores; and (iii) transfer to 7-Eleven the receipts, cash register fund, prepaid operating expenses, money order blanks, bank drafts, lottery tickets and Store supplies.

82.     Tariq and Senita also agreed that, upon termination of the Franchise Agreements, they would cease using the 7-Eleven Marks.

## Overview of the Various Schemes

83.     Virtually identical schemes were conducted systematically in each of the Stores.  In summary, the POS register was manipulated by defendants so as to not report, or underreport, merchandise sales; and the POS register was also bypassed entirely.  The fraudulent activities were committed personally by each of the specifically-named defendants, and the DOE defendants, other than Tariq (who did not handle the POS register).  Tariq, however, was present in each of the Stores and was able to monitor the activities at the POS registers by video in the Stores' offices.

84.     As above averred, merchandise purchases were made from various vendors, but were not reported as required by the Franchise Agreements.  Certain of the merchandise inventory was transferred to independent convenience stores owned directly or indirectly by Tariq.  During inventory audits, merchandise was

also transferred from store to store to manipulate inventory levels. Tariq also caused substantial inventory and cash shortages to be reported, in the millions of dollars, to intentionally understate Tariq and Senita's reported income, to the detriment of Federal and State governments, and to the economic detriment of 7-Eleven (inasmuch as the reported value of the subject Stores, and 7-Eleven® stores generally, was diminished by such conduct). The cash illicitly siphoned from the Stores, in addition to going into the pockets of Tariq, Senita and their co-conspirators, was used to pay workers in cash.

85.    The specifics of defendants' recent delicts are set forth herein. The delicts, and the potential scope of defendants' illicit conduct, were first discovered in an operational review of one of the Stores. An operation review is an analysis of a Store's operations routinely conducted by 7-Eleven prior to the expiration of the then-current term of a franchise agreement.

**The March 2010 Operational Review**

86.    In connection with a proposed renewal of the Merrick Road Franchise Agreement, an operational review of such Store's transactions (covering a 12-month period) was conducted. It was completed in March 2010. The results, summarized below, were so startling that, in lieu of confronting Tariq with such results, an investigation of all the Stores, under the auspices of 7-Eleven's Asset Protection Department, was commenced.

87.     The operational review of the Merrick Road Store revealed numerous deficiencies and delicts, none of which has a benign explanation.   Such matters included, among others:

    (i)    Write-offs (of out-of-date or bad merchandise) in fresh foods, particularly fresh bakery, exceeded write-off dollars available (purchases less sales).

    (ii)    Sales of merchandise, such as Poland Springs bottled water, at prices significantly in excess of prices reported by defendants to 7-Eleven.

    (iii)    Reported sales of merchandise in selected categories, such as alcoholic beverages and non-alcoholic beverages, exceeded reported purchases in such categories by more than $150,000.

    (iv)    Reported purchases in other categories, such as cigarettes, snacks, wholesale items and phone cards, exceeded reported sales in significant amounts.

- With regard to pre-paid phone cards alone, purchases of $9,360 from a vendor (owned and/or operated by Rajesh) were reported during the same 8-month period in which only a single ($2) sale was reported.

    (v)    During the 12-month period, inventory shortages in excess of $125,000 occurred -- far in excess of the Market average -- without complaint by the franchisee.

88.     The foregoing results are indicative of a franchisee's operating a "business within a business," which deprive 7-Eleven of its contractual share of the Store's gross profit and which result in an understatement of net income to the detriment of 7-Eleven and the State and Federal authorities.

**Expansion of the Investigation**

89.    Shortly following analysis of the operational review, 7-Eleven elected to expand its review to encompass all of the Stores.  In addition to a review of reported financial results, "secret shots" and surveillance were conducted.  The operational discrepancies found during the operational review of the Merrick Road Store were found to be present in all of the Stores.  Those discrepancies may be summarized as follows.

**Intentional Inventory Shortages**

90.    Inventory audits are conducted quarterly at each of the Stores. Outside auditors make a physical count of the merchandise on hand, and such results are compared to the Retail Book Inventory.  Virtually every audit conducted at the Stores resulted in significant inventory shortages.  Although the franchisee has the right to contest the reported results of the audit, and request a reaudit, Tariq did not request reaudits or complain about the significant, ongoing shortages.

91.    During the 40-month period from October 8, 2009 through February 15, 2013, the Stores experienced inventory shortages in excess of $2.43 million in the aggregate, as follows:

| Store Number | Store Location | Research Period | Audit History / Research Period |
|---|---|---|---|
| 11159 | Brooklyn Avenue | 10-08-09 to 2-15-13 | ($527,084.25) |

31

| Store Number | Store Location | Research Period | Audit History / Research Period |
|---|---|---|---|
| 11179 | Atlantic Avenue | 10-08-09 to 2-15-13 | (477,454.10) |
| 23407 | Merrick Road | 10-08-09 to 2-15-13 | (507,870.60) |
| 24568 | Hempstead Turnpike | 10-08-09 to 2-15-13 | (581,753.97) |
| 32371 | Sunrise Highway | 10-08-09 to 2-15-13 | (335,979.95) |
| | | | ($2,430,142.80) |

92.     Inventory shortages are charged to the franchisee as an expense, thus reducing reported net income, in this case by more than $2.43 million.  There are several causes of inventory shortages, including customer theft and employee theft.  The above shortages, however, were underlined multifold the average inventory shortages of the 107 or so 7-Eleven® stores in Market 2422 and were "accepted" without complaint by Tariq and Senita.  Other causes of inventory shortages include failure to record merchandise sales and transfer of inventory purchased by the Stores to locations outside the Stores, both of which occurred in this case.  In particular, merchandise was observed to have been transferred by defendants in a vehicle

owned by Tariq to a Gulf Express located at 700 Nassau Boulevard in West Hempstead, which is also owned by Tariq.

## Misretailing

93.    Cash purchases from certain vendors, such as B-Squared Distributors, DC Wholesalers, Premier Snacks, Long Island Nut Company and Raj Enterprises (owned by Rajesh) were reported only in part by the Stores to 7-Eleven.  In respect of those purchases actually reported to 7-Eleven, such merchandise was generally sold at prices higher than those reported to 7-Eleven.  Such practice, prevalent in each of the Stores, intentionally deprives 7-Eleven of its contractual share of the gross profit on the difference between the actual sales price and the reported sales price.

## Excessive Write-Offs

94.    Among other things, all of the Stores wrote off fresh food merchandise, particularly bagels, rolls and grill items, in excess of write-off dollars available (reported purchases less reported sales).  Excessive write-offs of such products create artificial inventory overages which mask inventory shortages resulting from unreported sales.

## Unreported Sales

95.    As part of its initial investigation, 7-Eleven secured video from Store 11179 (the Atlantic Avenue store) for a  3-month period covering June 2010- August 2010.   The transactions observed visually were compared with the

transactions recorded on the electronic journal. Of the 2985 transactions observed during 15 hours selected at random, 185 transactions (or 7.1%) were fraudulent. Fifteen (15) of the 185 fraudulent transactions consisted of various sales associates' bypassing the cash register entirely, whereas the other transactions involved misrecording transactions, such as using the cancel age verification [CAV] key – correctly used to reflect an aborted sale of an age-restricted product because the putative purchaser did not possess proper identification – to make it appear as though a sale was not consummated, but which in fact was fully consummated, *i.e.*, the product was purchased and the money changed hands – as shown by the videotape.

96.     The misreporting and non-reporting of merchandise sales transactions during the summer of 2010 has continued to date. By way of example, cigarettes and beer are age-restricted products. Both statistical evidence as well as secret shops at each of the Stores confirm the fraudulent misuse of such cash register keys – actual sales (with products being purchased by customers) were "cancelled" with the money from such purchases being pocketed by defendants.

**Statistical Evidence**

97.     From a statistical standpoint, the Stores used the CAV key in amounts far in excess of what can be subject to a benign explanation. Comparing the Stores

with the 107 stores in Market 2422, during the period 10/1/12 through 3/24/13, reveals the following:

| Cancel Age Verification by Product Short Name | | | | | |
|---|---|---|---|---|---|
| | Market 2422 – minus TK (102 stores) | Avg per store (not including TK) | TK Stores Total (5 Stores) | Average per TK Store | % > Avg |
| MarlbGldBxKg | 3634 | 36 | 1045 | 209 | 587% |
| NwprtBxKg | 2896 | 28 | 968 | 194 | 683% |
| MarlbBxKg | 1994 | 20 | 630 | 126 | 645% |
| ParlmntWhtBxKg | 1688 | 17 | 494 | 99 | 598% |
| DutchMstrPalmaCgr19g | 1673 | 16 | 281 | 56 | 341% |
| MarlbSlvrBxKg | 747 | 7 | 148 | 30 | 410% |
| NwprtMnthGldBx | 520 | 5 | 139 | 28 | 549% |
| Bud 24z Can | 365 | 4 | 124 | 25 | 699% |
| Bud Lt 3pk 24z Cn | 272 | 3 | 113 | 23 | 863% |
| CoronaXtra6pk12zLnBt | 223 | 2 | 179 | 36 | 1647% |

98.    The excessive use of the CAV key was consistent in each of the Stores.  Analogous (excessive) use of the CAV key also occurred throughout the years 2010-2012.

**Secret Shops**

99.    During the several months preceding the filing of this Complaint, 7-Eleven conducted 246 "secret shops" in the Stores – ranging from between 40 shops in the Hempstead Turnpike store to 55 shops in each of the Merrick Road and the Sunrise Highway stores.   Many of these shops were videotaped, and virtually all of the shops were compared with the record of such transactions on the electronic journal.

100.   Of the 246 "secret shops," 31 (or 12.6%) of the transactions bypassed the register entirely – the money changed hands and was placed in (or in some cases below) – the cash drawer.   In multiple other shops, the items (mostly "high ticket" items) such as cigarettes and beer were improperly rung using the CAV key or "grocery no tax" to underreport the sale.   In every transaction involving Skoal Wintergreen, which retails at $7.09, at the Merrick Road store, such product was recorded as being sold as a hot beverage refill at a price of $1.36, thus enabling the defendants to pocket the difference between the actual retail sale price and that recorded by defendants, each of whom participated, directly or indirectly, in such schemes.

**Unreported Purchases**

101.   In several key categories, such as alcoholic beverages, health and beauty care (HABC), non-alcoholic beverages and tobacco, after making

36

adjustments for the beginning and ending inventory in such categories, reported merchandise sales exceeded reported purchases of such merchandise by multiple tens of thousands of dollars.  Inasmuch as merchandise does not simply grow by itself on the shelves, the most viable explanation is that the Stores brought in merchandise that was not reported to 7-Eleven in violation of the Franchise Agreements.  Such anomaly is also indicative of a franchisee's operating a "business within a business."

## Overstated Cost of Goods Sold

102.  Tariq caused invoices for certain expenses, which are the sole responsibility of the franchisee, to be submitted as inventory purchases.

103.  The foregoing practice falsely increases the cost of goods sold and, therefore, deprives 7-Eleven of its contractual share of the gross profit on the overstated cost of goods.

## Illicit Labor Practices

104.  At least three of the Stores – the Brooklyn Avenue, the Atlantic Avenue and the Merrick Road stores – have reported labor costs, as a percentage of reported revenues, in amounts substantially less than the Market average, and less than the number of employees necessary to reasonably handle the volume of reported business.  Such low percentages at the aforesaid Store are inflated by the

presence on the payroll of persons, primarily family members, who do <u>not</u> work at the Stores.

105.   There are employees who work in excess of the number of hours reported by Tariq and Senita to 7-Eleven.  Tariq and Senita also employ workers whose names do not match the social security numbers provided for such individuals.

**The Economic Impact of the Scheme on 7-Eleven**

106.   Although the damage to 7-Eleven caused by defendants' illicit, longstanding, schemes cannot be measured solely in dollars, in dollar terms, 7-Eleven estimates that the foregoing activities, among other things, have resulted in dollar losses to 7-Eleven substantially in excess of $1,000,000 and caused additional damages to 7-Eleven.

**COUNT ONE**
**(Against All Defendants for Violation of the Racketeer Influenced**
**and Corrupt Organizations Act ("RICO") - 18 U.S.C. § 1962[c])**

107.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 106 as if fully set forth herein.

108.   7-Eleven is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

109.  Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer Camacho and Shahid are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(a).

110.  The following persons and organizations constitute "enterprises" under 18 U.S.C. §§ 1961(4) and 1962(e):

(a)   the Brooklyn Avenue store; and/or

(b)   the Brooklyn Avenue store and Tariq; and/or

(c)   the Brooklyn Avenue store, Tariq and Senita; and/or

(d)   the Brooklyn Avenue store, Tariq, Senita and Farouq; and/or

(e)   the Brooklyn Avenue store, Tariq, Senita, Farouq and Rajesh; and/or

(f)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh and Iram; and/or

(g)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram and Wattoo; and/or

(h)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail; and/or

(i)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail and Rana; and/or

(j)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana and Tanveer; and/or

(k)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer and Camacho; and/or

(l)   the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho and Shahid; and/or

(m)  the Brooklyn Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho, Shahid and the DOE defendants; and/or

(n)  the Atlantic Avenue store; and/or

(o)  the Atlantic Avenue store and Tariq; and/or

(p)  the Atlantic Avenue store, Tariq and Senita; and/or

(q)  the Atlantic Avenue store, Tariq, Senita and Farouq; and/or

(r)  the Atlantic Avenue store, Tariq, Senita, Farouq and Rajesh; and/or

(s)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh and Iram; and/or

(t)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram and Wattoo; and/or

(u)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail; and/or

(v)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail and Rana; and/or

(w)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana and Tanveer; and/or

(x)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer and Camacho; and/or

(y)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho and Shahid; and/or

(z)  the Atlantic Avenue store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho, Shahid and the DOE defendants; and/or

(aa)  the Merrick Road store; and/or

(bb)  the Merrick Road store and Tariq; and/or

(cc)  the Merrick Road store, Tariq and Senita; and/or

40

(dd)   the Merrick Road store, Tariq, Senita and Farouq; and/or

(ee)   the Merrick Road store, Tariq, Senita, Farouq and Rajesh; and/or

(ff)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh and Iram; and/or

(gg)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram and Wattoo; and/or

(hh)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail; and/or

(ii)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail and Rana; and/or

(jj)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana and Tanveer; and/or

(kk)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer and Camacho; and/or

(ll)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho and Shahid; and/or

(mm)   the Merrick Road store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho, Shahid and the DOE defendants; and/or

(nn)   the Hempstead Turnpike store; and/or

(oo)   the Hempstead Turnpike store and Tariq; and/or

(pp)   the Hempstead Turnpike store, Tariq and Senita; and/or

(qq)   the Hempstead Turnpike store, Tariq, Senita and Farouq; and/or

(rr)   the Hempstead Turnpike store, Tariq, Senita, Farouq and Rajesh; and/or

(ss)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh and Iram; and/or

41

(tt)   the Hempstead Turnpike store, Tariq, Senita Farouq, Rajesh, Iram and Wattoo; and/or

(uu)   the Hempstead Turnpike, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail; and/or

(vv)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail and Rana; and/or

(ww)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana and Tanveer; and/or

(xx)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer and Camacho; and/or

(yy)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho and Shahid; and/or

(zz)   the Hempstead Turnpike store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho, Shahid and the DOE defendants; and/or

(aaa)   the Sunrise Highway store; and/or

(bbb)   the Sunrise Highway store and Tariq; and/or

(ccc)   the Sunrise Highway store, Tariq and Senita; and/or

(ddd)   the Sunrise Highway store, Tariq, Senita and Farouq; and/or

(eee)   the Sunrise Highway store, Tariq, Senita, Farouq and Rajesh; and/or

(fff)   the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh and Iram; and/or

(ggg)   the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram and Wattoo; and/or

(hhh)   the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo and Sohail; and/or

(iii)   the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail and Rana; and/or

(jjj)    the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana and Tanveer; and/or

(kkk)    the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer and Camacho; and/or

(lll)    the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho and Shahid; and/or

(mmm)    the Sunrise Highway store, Tariq, Senita, Farouq, Rajesh, Iram, Wattoo, Sohail, Rana, Tanveer, Camacho, Shahid and the DOE defendants; and/or

(nnn)  any combination of the foregoing.

111.    Each of the aforementioned enterprises was, and is, engaged in, and their activities affected, and affect, interstate trade and commerce.

112.    Alternatively, each of the defendants, and certain entities or individuals associated with them, including certain employees of the Stores, constitute a group associated in fact with regard to the unlawful conduct alleged herein and therefore constitute an "enterprise" that is engaged in, whose activities affect, interstate or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

113.    Defendants, each being a "person" employed by or associated in fact with an "enterprise" hereinabove identified, conducted or participated (as principals and/or accomplices and/or conspirators), directly or indirectly, in the conduct of the "enterprise's" affairs through the pattern of racketeering activities hereinabove and hereinafter described.

114.   Defendants have each engaged in two or more predicate acts of racketeering activities during the past three years.

115.   Between on or prior to January 1, 2009 and the date of this Complaint, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, Tariq knowingly and intentionally devised a scheme and artifice to defraud 7-Eleven and obtain money and property from it by means of materially false and fraudulent representations and omissions.

116.   In order to more fully effectuate his fraudulent scheme, Tariq made and caused to be made communications that were transmitted in interstate commerce as set forth below.  In particular, on a daily basis, Tariq made or caused to be made Cash Reports that were transmitted by wire to 7-Eleven.  Each such Cash Report submitted to 7-Eleven by or on behalf of Tariq, from the Stores, was knowingly false and fraudulent, in that, among other things, it intentionally understated receipts, and fraudulently concealed inventory purchases made in cash from such diverted receipts.  Each such Cash Report constitutes a communication in interstate commerce made for the purpose of executing the previously devised scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent representations, all in violation of 18 U.S.C. § 1343.

117.   Each of the interstate communications made in furtherance of the scheme constitutes a distinct and separate offense under the wire fraud statute, 18

44

U.S.C. § 1343. Each such offense constitutes "racketeering activity" within the meaning of Section 1961(1) of RICO. By committing these offenses over a period of three or more years, during which defendants victimized 7-Eleven, defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 and 1962.

118. The aforementioned activities constitute the making of false entries in the business records of an enterprise in violation of § 175.05 of the Penal Law of the State of New York.

119. Defendants' unlawful activities, as well as the normal day-to-day operations of the Stores, involve and affect interstate commerce. Additionally, the activities alleged in this case had an adverse impact on 7-Eleven which operates in interstate commerce.

120. Defendants and their co-conspirators form an association-in-fact enterprise which is engaged in, and whose activities affect, interstate commerce.

121. Defendants have conducted or participated, directly or indirectly, in the management and operation of their association-in-fact enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

122. 7-Eleven has been injured in its business or property by reason of this violation of 18 U.S.C. § 1962(c).

123.   By virtue of defendants' violation of 18 U.S.C. § 1962(c), defendants are liable, jointly and severally, to 7-Eleven for three times the damages that 7-Eleven suffered as a result of defendants' fraudulent actions, plus the costs of this suit, including reasonable attorneys' fees.

## COUNT TWO
### (Against All Defendants for
### Conspiracy to Violate RICO -- 18 U.S.C. § 1962[d])

124.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

125.   Defendants and their co-conspirators agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting or participating in, directly or indirectly, the affairs of the enterprises identified in paragraph 110 above through a pattern of racketeering activity, thereby violating 18 U.S.C. § 1962(d).

126.   In furtherance of the conspiracy, defendants and their co-conspirators each agreed to commit two or more predicate acts of racketeering and engage in other wrongful acts in connection therewith.

127.   7-Eleven has been injured in its business or property by reason of this conspiratorial conduct.

128.   By virtue of defendants' violation of 18 U.S.C. § 1962(d), defendants are liable, jointly and severally, to 7-Eleven for three times the damages that 7-Eleven suffered as a result of the actions that defendants and their co-conspirators

undertook in furtherance of their conspiracy, plus the costs of this suit, including reasonable attorneys' fees.

## COUNT THREE
### (Against All Defendants -- Common Law Fraud)

129.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.   In submitting daily Cash Reports and reports of inventory purchases, defendants either directly or through their designated agents: misstated, misrepresented and/or omitted to state and disclose material facts concerning the (i) receipt, use, disposition and diversion of funds received from merchandise sales at the Stores; and (ii) the purchase of and payments for inventory for the Stores.

131.   The representations by defendants relating to the quantum of merchandise sales and purchases of inventory, as reported to 7-Eleven by them, were false, and defendants were aware at the times that they made such representations that they were false.

132.   The representations as to the quantum of merchandise sales and purchases of inventory intentionally deprived 7-Eleven of the franchisor's share of the gross profit on unreported merchandise sales and overstated cost of goods sold.

133.   7-Eleven justifiably relied upon the veracity and integrity of reports generated by the defendants.

134.   All of the foregoing material misstatements and misrepresentations of material facts and/or omissions of material facts were known by defendants to have been false when made, and were made by defendants deliberately and with an intent to deceive and to understate, and to deprive 7-Eleven of the amount of monies due 7-Eleven on account of, the 7-Eleven Charge and to enable defendants to siphon cash from the Stores' operations for the sole use and benefit of defendants.

135.   The falsity of such information was unknown to 7-Eleven, and 7-Eleven rightfully relied on the completeness and legitimacy of all statements and representations, submissions, receipts and claims made by defendants.

136.   The foregoing actions and practices of defendants, each of whom acted in concert with the other named defendants, were willful, fraudulent, intentional, involve a high degree of moral turpitude and violate Federal and State laws as hereinabove alleged.

137.   Defendants knew and intended that 7-Eleven would rely to its detriment upon defendants' misrepresentations and omissions.

138.   7-Eleven reasonably relied to its detriment upon defendants' misrepresentations and omissions.

139.   By virtue of the fraudulent acts and schemes described in this Complaint, defendants are liable to 7-Eleven for the damages that 7-Eleven

48

suffered as a result of defendants' actions and schemes, plus punitive damages in an amount to be determined at trial.

## COUNT FOUR
### (Against Tariq and Senita -- Breach of Contract)

140.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 139 as if fully set forth herein.

141.   In the Franchise Agreements, Tariq and Senita covenanted and agreed, among other things, that they would:

(a)   Cause all sales of inventory to be properly recorded at the time of sale at the retail prices set by Tariq and Senita and generally offered by Tariq and Senita to customers of the Stores;

(b)   Use electronic equipment provided by 7-Eleven to scan the sale of all products capable of being scanned;

(c)   Prepare and furnish to 7-Eleven actual sales data;

(d)   Prepare and furnish to 7-Eleven daily reports of receipts;

(e)   Deposit on a daily basis, in a bank account designated by 7-Eleven, all sales proceeds, discounts or allowances received from each day's operation of the Stores, except for cash actually expended by Tariq and Senita for purchases or operating expenses properly reported and accompanied by bona fide invoices reflecting such payment;

(f)   Prepare and furnish to 7-Eleven daily summaries of purchases;

(g)   Furnish to 7-Eleven copies of invoices for purchases;

(h)   Timely submit the Cash Report to 7-Eleven;

(i)   Prepare and furnish to 7-Eleven weekly time and wage authorizations for the Stores' employees;

(j)   Keep 7-Eleven currently advised in writing of all discounts, allowances and/or premiums received in connection with the operation of the Stores;

(k)   Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven may implement from time to time;

(l)   Pay all sales, payroll and income taxes with regard to the operation of the Stores;

(m)   Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Stores;

(n)   Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreements); and

(o)   Devote their best efforts to the business of the Stores and maximization of the Stores' sales and gross profit, and cause the Stores to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image.

142.   Tariq and Senita materially breached the Franchise Agreements and failed substantially to comply with their aforesaid obligations under the Franchise Agreements in the particulars above described.

143.   7-Eleven has duly performed all of the obligations on its part to be performed under the Franchise Agreements.

144.   As a result of the aforementioned material breaches by Tariq and Senita of the Franchise Agreements, 7-Eleven has been deprived of the full benefits to which it is entitled under the Franchise Agreements.

145.   By reason of the foregoing, 7-Eleven has suffered damages in a precise amount to be determined at trial but estimated to be not less than $1,000,000.

## COUNT FIVE
### (Declaratory Judgment against Tariq and Senita)

146.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 145 as if fully set forth herein.

147.   By virtue of the conduct of defendants hereinabove described, on June 21, 2013, 7-Eleven issued and delivered to Tariq and Senita a Non-Curable Notice of Material Breach and Termination of the Franchise Agreements (the "Notice of Termination"), to which Notice of Termination reference is made for the full contents thereof.

148.   7-Eleven contends (a) that the Notice of Termination cannot be cured, among other reasons, given the serious, willful, material breaches of trust, good faith and fair dealing (as well as of the terms of the respective Franchise Agreements) that such defendants' activities described in the Notice of Termination entail, which violate the very core of the contractual relationships between Tariq and Senita, on the one hand, and 7-Eleven, on the other.

149.   Tariq and Senita contend that the Notice of Termination is improper and of no force and effect.

150.   Actual, existing and justiciable controversies have arisen and exist between 7-Eleven, on the one hand, and Tariq and Senita, on the other, as to whether 7-Eleven validly and effectively terminated forthwith the Franchise Agreements.

151.   7-Eleven has no adequate remedy at law.

## COUNT SIX
### (Against Tariq and Senita -- Trademark Infringement)

152.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 151 as if fully set forth herein.

153.   Although the Franchise Agreements have been terminated, as above alleged, and Tariq and Senita have lost their right to use the Trademarks, Tariq and Senita are intentionally trading on the 7-Eleven System, using the Trademarks, and deliberately misappropriating 7-Eleven's goodwill, all to the detriment of 7-Eleven.

154.   Tariq's and Senita's unauthorized use of the Trademarks is identical to the lawful use thereof by 7-Eleven and by thousands of other 7-Eleven franchisees; accordingly, Tariq's and Senita's conduct is intended to, and does, cause a likelihood of confusion or mistake.

155.   Tariq and Senita are attempting to palm off on the public an imitation of the 7-Eleven licensed and authorized services, to Tariq's and Senita's own profit

and advantage, thereby attempting to confuse or deceive the public as to Tariq's and Senita's authority to operate the stores as franchised 7-Eleven stores.

156.   Tariq's and Senita's conduct has been and continues to be undertaken with deliberate intention and design to trade on 7-Eleven's goodwill and constitutes willful, wanton and otherwise outrageous conduct.

157.   Tariq and Senita are guilty of trademark infringement pursuant to 15 U.S.C. § 1114 and Tariq's and Senita's false representation of association with 7-Eleven constitutes a false designation of products and services in violation of 15 U.S.C. § 1125.

158.   7-Eleven has been irreparably injured by its inability to control the use of its Trademarks, the representations of authority that Tariq and Senita make to the public, and dilution of 7-Eleven's profits and goodwill.

159.   7-Eleven has no adequate remedy at law.

160.   7-Eleven is incurring immediate and irreparable harm by Tariq's and Senita's unfair competition.

## COUNT SEVEN
### (Against Defendants -- Mandatory Injunction)

161.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 160 as if fully set forth herein.

162.   7-Eleven is being, and will continue to be, irreparably damaged and injured by the aforementioned practices of defendants, which include interference

with 7-Eleven's property rights, and unless defendants are directed to quit and deliver to 7-Eleven possession of the Stores, including the equipment and inventory therein, 7-Eleven will be caused irreparable injury and damage.

163.   7-Eleven has no adequate remedy at law.

## COUNT EIGHT
### (Against Tariq and Senita -- Recovery of Chattels)

164.   7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 163 as if fully set forth herein.

165.   7-Eleven holds a perfected security interest in the inventory and proceeds of the Stores.

166.   The Security Agreement for each of the Stores provides that, upon termination of the Franchise Agreements, defendants are to assemble the collateral and make it available to 7-Eleven at a place designated by Eleven (each of the respective Stores).   Further, 7-Eleven is given the right to take possession of the collateral in the event of default.

167.   On June 21, 2013, 7-Eleven exercised its right under the Franchise Agreements to discontinue the financing of any unpaid balances in the Open Accounts at the Stores, and demanded immediate repayment of the unpaid balances in the Open Accounts ("Open Accounts Indebtedness").

168.   As a consequence of the defendants' failure to pay the Open Accounts Indebtedness, 7-Eleven has made demand, pursuant to the Franchise Agreements,

that defendants permit 7-Eleven to take immediate possession of the inventory, and its proceeds, at the Stores.

169.   Defendants have declined to voluntarily vacate the Stores and have wrongfully refused to turn over 7-Eleven's property (the inventory and proceeds subject to 7-Eleven's security interests).

170.   As a direct result of defendants' actions as set forth above, 7-Eleven's security interest has been harmed.

171.   7-Eleven will be irreparably injured if defendants are permitted to retain possession of the inventory, proceeds and other property subject to its security interest, and has no adequate remedy at law for such injury.

172.   Pursuant to Federal Rule of Civil Procedure 64, expressly permitting this Court to order a recovery of chattels by 7-Eleven under New York law, 7-Eleven files this claim for recovery of chattels against Tariq and Senita who have unjustly detained all inventory, supplies, sales proceeds, equipment and fixtures of the Stores, in which property 7-Eleven has valid security interests.  Such property in each of the Stores is estimated to have a retail value in excess of $75,000.

**WHEREFORE**, 7-Eleven demands that a judgment be entered in its favor, as follows:

1.   On Count One, against all defendants, jointly and severally, awarding 7-Eleven treble compensatory damages suffered by 7-Eleven as a result of

defendants' fraudulent actions in violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, plus the costs of this suit, including reasonable attorneys' fees.

2.     On Count Two, against all defendants, jointly and severally, awarding 7-Eleven treble compensatory damages suffered by 7-Eleven as a result of the actions that defendants and their co-conspirators undertook in furtherance of their conspiracy in violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial, plus the costs of this suit, including reasonable attorneys' fees.

3.     On Count Three, against all defendants, awarding compensatory damages that 7-Eleven suffered as a result of defendants' actions and schemes, plus punitive damages, in amounts to be determined at trial, the costs of this suit and reasonable attorneys' fees.

4.     On Count Four, against Tariq and Senita, awarding 7-Eleven compensatory damages in a precise amount to be determined at trial but estimated to be not less than $1,000,000.

5.     On Count Five, against Tariq and Senita, that the Court determine and declare that (i) 7-Eleven's termination of the Franchise Agreements was valid, proper and effective, (ii) 7-Eleven is legally entitled to possession of the Stores, together with the equipment and merchandise inventory therein, and (iii) Tariq and

Senita have no further rights in or to any of the aforementioned Stores or under the Franchise Agreements.

6.     On Count Six, against Tariq and Senita:

(a)     That Tariq and Senita and their agents, servants, employees and all persons acting in concert or participation with them, or holding by, through or under them, or acting under the authority of or in privity with them, and each and all of them, be enjoined and restrained, at first preliminarily during the pendency of this action, and thereafter permanently, from:

(i)     using 7-Eleven's Trademarks, or any colorable imitation thereof, and from engaging in conduct suggesting any affiliation or connection with 7-Eleven;

(ii)     advertising, distributing, offering for sale or selling goods and services bearing the Trademarks;

(iii)     otherwise infringing 7-Eleven's Trademarks, or diluting the distinctive quality of the Trademarks; and

(iv)     committing any other act or acts which are calculated to induce the belief that goods and services not of 7-Eleven's sponsorship are of 7-Eleven's sponsorship and from otherwise competing unfairly with 7-Eleven in any manner.

(b)     That Tariq and Senita be required to deliver up to 7-Eleven all indicia of 7-Eleven's Trademarks and Trade Secrets in Tariq's possession or under his control.

(c)     That Tariq and Senita be ordered to file with the Court and to serve upon 7-Eleven's attorneys within ten (10) days after service upon such individual of the Decree of Injunction issued by the Court in this action, a report in writing setting forth in detail the manner and form in which such individual has complied with such injunction.

(d)     That Tariq and Senita be required to account to 7-Eleven for all profits made by virtue of said individuals' infringement of 7-Eleven's 7-

57

Eleven Service Mark, its other proprietary marks and trade dress and by virtue of such individual's unfair competition.

(e)   Treble damages pursuant to 15 U.S.C. § 1117.

(f)   That 7-Eleven have and recover from Tariq and Senita punitive damages in an amount to be determined.

(g)   That 7-Eleven have and recover from Tariq and Senita 7-Eleven's reasonable attorneys' fees.

7.   On Count Seven, against defendants, the Court adjudge that defendants be compelled to quit and deliver to 7-Eleven possession of the Stores, including the equipment and inventory therein.

8.   On Count Eight, against Tariq and Senita, that the Court order and adjudge that 7-Eleven is entitled to replevy the secured inventory, proceeds thereof, and equipment, at each of the Stores.

9.   7-Eleven be awarded such other and further relief as the Court may deem just and equitable.

**DUANE MORRIS LLP**

By: /s/ _____
    Stephen Sussman (SS-1072)
    E-mail:   ssussman@duanemorris.com
    Susan V. Metcalfe (SM-4694)
    E-mail:   svmetcalfe@duanemorris.com
    Joseph J. Aronica
    E-mail:   jjaronica@duanemorris.com

    1540 Broadway
    New York, NY 10036-4086
    Telephone: +1 212 692 1000
    Fax: +1 212 692 1020

    *Attorneys for Plaintiff, 7-Eleven, Inc.*

Dated: June 21, 2013