**FILED**
**CLERK**

10/10/2013 12:02 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
7-ELEVEN, INC.,

                      Plaintiff,

           -against-

TARIQ A. KHAN, SENITA KHAN,
FAROUQ KHAN, RAJESH M. AJMERI.
IMRAN M. KHAN, MOHAMMED TARIQ
WATTOO, ASAID SOHAIL, ANSARUL H.
RANA, MOHAMMED TANVEER, FAITH
E. COMACHO, SHAHID F. KHAN, and
DOES 1 through 50, inclusive,

                      Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CV-3538 (ADS)(ARL)

**APPEARANCES:**

**Duane Morris LLP**
*Attorneys for the Plaintiff*
1540 Broadway
New York, NY 10036
  By: Joseph J. Aronica, Esq.
     James M. Parks, Esq.
     Susan V. Metcalfe
     Stephen Sussman, Esq., Of Counsel

**Einbinder & Dunn, LLP**
*Attorneys for the Defendants Tariq A. Khan, Senita Kahn, Farouq Khan, and Iram M. Khan*
104 West 40th Street
20th Floor
New York, NY 10018
  By: Michael Einbinder, Esq., Of Counsel

**Forchelli, Curto, Deegan, Schwartz, Mineo & Terrana, LLP**
*Attorneys for the Defendants Tariq A. Khan, Senita Kahn, Farouq Khan, and Iram M. Khan*
The Omni
333 Earle Ovington Blvd
Suite 1010
Uniondale, NY 11553
  By: Andrew E. Curto, Esq., Of Counsel

**NO APPEARANCES:**

Rajesh M. Ajmeri
Mohammed Tariq Wattoo
Asaid Sohail
Ansarul H. Rana
Mohammed Tanveer
Faith E. Camacho
Does 1 through 50, inclusive

**Spatt, Judge:**

Pending before the Court are the objections of the Defendants Tariq A. Khan, Senita Khan, Farouq Khan a/k/a/ Shahid F. Khan, and Imran M. Khan s/h/a Iram M. Khan (collectively "the Khans") to the August 19, 2013 Report and Recommendation of United States Magistrate Judge Arlene R. Lindsay. The Report recommended that this Court grant the Plaintiff 7-Eleven, Inc.'s motion for a preliminary injunction and deny the Khans' motion for injunctive relief. Familiarity with that Report is presumed. For the reasons set forth below, the Court adopts the recommendation in its entirety.

# I.  BACKGROUND

## A.  Procedural Background

On June 21, 2013, 7-Eleven filed this complaint against the Defendants, franchisee-owners and employees of five 7-Eleven convenience stores on Long Island, alleging, among other contentions, that the Defendants diverted profits over the course of at least four years, from 2009 to 2013, in violation of the parties' franchise agreements.

Thereafter, 7-Eleven moved for a temporary restraining order (TRO) enjoining Tariq and Senita Khan from (1) failing to cause all sales of inventory to be properly recorded at the time of the sale at the retail price reported to 7-Eleven; (2) failing to use the electronic equipment

provided by 7-Eleven to scan all products capable of being scanned; (3) failing to turn over to 7-Eleven all receipts for the preceding 24-hour collection period, except for cash expended by the Khans during such 24-hour collection period for bona fide purchases or operating expenses paid during such collection period; (4) failing to furnish to 7-Eleven copies of invoices for all purchases; (5) failing to timely furnish to 7-Eleven copies of invoices for all purchases; (6) removing any inventory from the Stores other than in the ordinary course of business; (7) removing or destroying any Store-related records; (8) failing to preserve, protect, and maintain all documents in their possession or under their control concerning the subject matter of this action.

The Khans then moved for a TRO enjoining 7-Eleven from (1) terminating their franchise rights in the stores and/or enforcing the termination notice directed toward them; (2) altering the status quo of its franchise relationship with the Owner Khans; (3) interfering with the Owner Khans' conduct of business with the McLane Company and/or the Central Distribution Center in any way; (4) ceasing payroll services, sales tax processing and payments for workers compensation, disability insurance, and unemployment insurance; (5) interfering with the Owner Khans' lottery sales, including removal of equipment; (6) removing any additional equipment or inventory from the stores until the return date on the order to show cause; and (7) requiring 7-Eleven to return any and all equipment and inventory removed from the Stores immediately.

In an oral ruling on the record on July 2, 2013, the Court (1) granted 7-Eleven's request for a TRO; (2) denied the Khans' request for a TRO with leave to renew except to the extent that it directed 7-Eleven to return the lottery machines; (3) directed that all evidence be preserved; and (4) denied the Khans' initial application for discovery, without prejudice to renewal.

In the interim, 7-Eleven moved by Order to Show Cause ("OSC") for a preliminary injunction pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 65.  Through the OSC, 7-Eleven sought an order directing the Khans (1) to surrender the subject stores to 7-Eleven and to eject them from the premises; (2) to preserve all security surveillance images located at the stores; (3) to allow 7-Eleven to copy all such images recorded within the stores, at any and all times, including all images stored and/or recorded on any type of analog or digital media such as digital video recorders ("DVRs"); and (4) to make the DVRs available to 7-Eleven for purposes of conducting a forensic review to attempt to recover any erased surveillance images.  The Khans opposed the motion and cross moved, seeking to enjoin 7-Eleven from (1) effectuating the termination of the franchise agreements for the subject convenience stores until there is a determination as to whether or not the Non-Curable Notice of Material Breach Termination delivered by 7-Eleven to the Khans Tariq A. Khan and Senita Khan was sufficient and proper under the franchise agreements; (2) interfering with the operation of the subject stores and customer relationships during the pendency of this matter; (3) interfering with the franchisees relationships with McLane Company and the Central Distribution Center; (4) altering the status quo of its franchise relationship with the Khans until this matter is resolved on the merits; and (5) from removing any additional equipment or inventory from any of the stores.

The Court referred the pending motions for injunctive relief to Judge Lindsay.  Following a six-day evidentiary hearing beginning on July 22, 2013, Judge Lindsay issued a comprehensive Report and Recommendation that 7-Eleven's motion for injunctive relief be granted and the Khans' motion for injunctive relief be denied.  On September 6, 2013, the Khans filed their objections to the Report and Recommendation.  On September 20, 2013, 7-Eleven filed a reply to

the Khans' objections.

**B.  Legal Standards**

     **1.  Standard of Review of Magistrate Judge Lindsay's Report and Recommendation**

A court is required to make a de novo determination as to those portions of the Report and Recommendation to which objections were made. 28 U.S.C. § 636(b)(1)(C); Grassia v. Scully, 892 F.2d 16, 19 (2d Cir. 1989).  The phrase "de novo determination" in Section 636(b)(1) – as opposed to "de novo hearing" – was selected by Congress "to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." United States v. Raddatz, 447 U.S. 667, 676, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980).  Section 636 does not require a court "to rehear the contested testimony in order to carry out the statutory command to make the required 'determination.'" Id. at 674, 447 U.S. 667, 100 S. Ct. 2406, 65 L. Ed. 2d 424.  Rather, in making such a determination, a court may in its discretion review the record and hear oral argument on the matter. See Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40 n. 3 (2d Cir. 1990). Furthermore, a court may in its sound discretion afford a degree of deference to the magistrate's Report and Recommendation. See Raddatz, 447 U.S. at 676, 100 S. Ct. 2406, 65 L. Ed. 2d 424.

In a case where a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (quoting Barratt v. Joie, No. 96 Civ. 324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002)).  "Furthermore, even in a de novo review of a party's specific objections, the Court ordinarily will not consider 'arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate

judge in the first instance.'" <u>Fairfield Financial Mortg. Group, Inc. v. Luca</u>, No. 06 Civ. 5962, 2011 WL 3625589, at *2 (E.D.N.Y. Aug. 16, 2011).

**2. <u>Standard for Issuance of a Preliminary Injunction</u>**

"The general standard for issuing a preliminary injunction requires that the movant show "(1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." <u>Johnson v. Burge</u>, 2012 U.S. App. LEXIS 25982 *11 (2d Cir. 2012)(quoting <u>Covino v. Patrissi</u>, 967 F.2d 73, 77 (2d Cir. 1992)). A preliminary injunction is considered an "extraordinary" remedy that should not be granted as a routine matter. <u>Id.</u>, <u>see also</u> <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 80 (2d Cir. 1990). In addition, where, as here, a preliminary injunction is sought to change the status quo, rather than to preserve the status quo, the movant is held to a higher standard of proof. <u>See</u>, <u>e.g.</u>, <u>Bronx Household of Faith v. Board of Educ. of City of New York</u>, 331 F.3d 342, 349 (2d Cir. 2003). Ultimately, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. <u>See</u> <u>American Exp. Financial Advisors Inc. v. Thorley</u>, 147 F.3d 229, 231 (2d Cir. 1998). This opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

**II. The Findings of Fact**

For purposes of this motion, the Court makes the following findings of fact.

A. <u>Parties</u>

7-Eleven is a Texas corporation that operates about 9,000 7-Eleven stores throughout North America. (Tr. at 32.) In order to identify its stores, products, and services, 7-Eleven allows

its franchises to utilize the 7-Eleven trademarks and trade names, such as "Slurpee," in connection with the operation, marketing, and identification of the convenience stores. (Tr. at 33.)

Tariq Khan and Senita Khan are the owners of five 7-Eleven franchises. (Tr. at 48.) The Defendant Imran Khan, the son of Tariq and Senita Khan, periodically worked in all five of the stores. (Tr. at 801-802.) The Defendant Farouq Khan, Tariq Khan's brother-in-law, was employed by Tariq Khan for almost twenty years and managed one of the stores. (Tr. at 935.) The Defendant Shahid Khan, Tariq Khan's brother, was also periodically employed at the stores. (Tr. at 934.)

On August 3, 1998, Tariq and Senita Kahn entered into a franchise agreement with 7-Eleven to operate a 7-Eleven store on Sunrise Highway in Freeport (the "Sunrise Highway" store). (Tr. at 51.) On December 21, 2001, Tariq Khan entered into a second franchise agreement with 7-Eleven on Merrick Road in Rockville Centre (the "Merrick Road" store). (Tr. at 50.) Finally, on May 15, 2004, Tariq Khan entered into three additional franchise agreements with 7-Eleven for stores on Brooklyn Avenue in Freeport (the "Brooklyn Avenue" store), on Atlantic Avenue in Lynbrook (the "Atlantic Avenue" store), and on Hempstead Turnpike in Elmont (the "Hempstead Turnpike" store). (Tr. at 50-51.)

B. <u>Relevant Portions of the Franchise Agreements</u>

Paragraph 26 of the franchise agreements provides that the agreements may be terminated, subject to the franchisee's right to cure, for the occurrence of any one or more of a number of events including the failure to properly record, deposit, deliver or expend and report receipts or deliver deposit slips, cash reports, and supporting documents, receipts for cash

purchases and invoices or other reports of purchases.

C. 7-Eleven Franchise System

Pursuant to the franchise agreements, the franchisee leases the store and equipment and is licensed to use the 7–Eleven® Service Mark, related trademarks, trade dress, and system of operations. A franchisee does not acquire ownership of the store, its premises, or any of the physical plant, all of which remain the property of 7–Eleven. Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations. The net income in which the franchisee-Khans have an interest is the amount remaining after deducting both operating expenses, such as payroll, and 7-Eleven's 50% share from the gross profits. (Tr. at 35.)

7-Eleven utilizes a Point-of-Sale ("POS") register system to record all sales on an electronic journal, which is accessible by 7-Eleven. (Tr. at 758-759.) Using the POS register system, merchandise purchased by a customer is electronically scanned, its price appears on the register, the cash tendered by the customer is recorded, a register drawer opens, and the customer is given any change from his or her purchase. (Tr. at 97-99.)

Since 2011, 7-Eleven can generate journals reflecting each transaction entered in the POS register using Exception Reporting Software known as "Secure." (Tr. at 114-15.) The Secure journals provide the store number, employee number, register number, transaction number, transaction date and time and transaction amount for each purchase. (Tr. at 115-17.) A digital copy of the sales receipt corresponding to each transaction can also be viewed. (Tr. at 118.)

The franchisees are required to submit daily cash reports and to make deposits of receipts, except for cash expended for purchases or operating expenses, into a designated 7-Eleven bank

account. (Tr. at 121-123.) The Daily Cash Report records any deductions to or from cash that affects the daily deposit. (Tr. at 624.) Upon receipt of the report, 7-Eleven's accounting department enters the information into its computerized accounting records. (Tr. at 673.)

7-Eleven finances the purchase of inventory for its stores and retains a security interest in that merchandise. (Tr. at 673.) Thus, when a franchisee purchases merchandise and supplies, the franchisee is required, pursuant to the franchise agreement, to report and submit the related invoice to 7-Eleven for recording and direct payment to the vendor. When 7-Eleven pays the invoice, the payment is charged to the franchisee through an Open Account, a running working capital account maintained by 7-Eleven for the benefit of its franchisee. (Tr. at 63.)

7-Eleven uses a retail method to account for inventory. (Tr. at 694.) Specifically, when a 7-Eleven store opens, the store is supplied with merchandise having a retail value of approximately $70,000 to $80,000. (Tr. at 34-35.) This opening inventory is the initial balance for retail book inventory reflected in the store's accounting records by 7-Eleven. (Tr. at 34-35, 39-40.) When a franchisee purchases merchandise for the store, its store's balance sheet, maintained by 7-Eleven, is increased by the retail value of that merchandise. (Tr. at 40.) Sales of merchandise, reported to 7-Eleven through the POS register, reduce the retail book inventory. (Tr. at 40, 758, 760.)

In order to track inventory, 7-Eleven retains RGIS, a private company, to conduct quarterly physical counts of each stores' inventory in order to compare a store's actual inventory in retail dollars against its book value. (Tr. at 604.) This quarterly audit is used to identify inventory shortages - that is, missing inventory not accounted for by sales. When inventory shortages occur, 7-Eleven reduces the franchisee's equity in the store by the cost value, rather

than the retail value of the inventory, and thus, does not account for any profit that would be lost due to the shortage. (Tr. at 758.) The Asset Protection Department investigates stores that show excessive inventory shortages. (Tr. at 281.) Pursuant to the franchise agreements, a franchisee dissatisfied with the results of an audit can request a re-audit the cost of which would be borne by 7-Eleven, or upon notice to 7-Eleven arrange for their own audit. (Tr. at 688.)

     D. <u>Inaccurate Reporting of Sales/Purchases</u>

Inaccurate or false reporting harms 7-Eleven by, among other things, depriving it of its full share of gross profit, causing franchisees to look less attractive for potential franchisees, and imposing potential liability for understatement of taxes.

It is possible for franchisees and employees to make false entries into the POS cash register to mask actual sales transactions. For example, they can use a number of POS keys to open the register drawer, enabling them to accept cash, and make change without recording the sale. As a consequence, with the Secure system, 7-Eleven generates reports which allow 7-Eleven to analyze the use of certain POS register keys which carry a high fraud risk. Register keys such as the No Sale, Cancel Age Verification (CAV key) and the Price Look Up (PLU key) present a larger opportunity for fraud because they can be used to create the impression that a sale is being processed through the register when in fact it is not. (Tr. at 123-25, 256.)

Each of the POS keys has a legitimate usage. For instance, the PLU key is used to inquire about the price of a product. When the key is pressed and the product is scanned, the price is displayed on the monitor. The CAV key cancels transactions for age-restricted products, such as beer and tobacco products, if the customer does not produce proper identification.

However, it is possible to use each of the "high risk" POS keys to commit fraud. For

instance, regarding the PLU key, in a multi-item transaction, a franchisee may scan one or two items legitimately (usually lower priced items), and then use the PLU inquiry key to scan other items without recording their sale. Because a part of the sale is being recorded, the register drawer opens and change can be given to the customer from the open register drawer.

E. The Investigation And Non-Curable Notice of Material Breach and Termination

In March 2010, 7-Eleven completed a twelve-month operational review of the Merrick Road store in connection with its renewal. (Tr. at 747-48.) This investigation was expanded to encompass all five of the Khans' stores when excessive inventory shortages were found to exist in all of Khan's stores. (Tr. at 280-85.) Inventory shortages can occur in one of three ways, that is, they can result from the failure to properly record a delivery, from shoplifting and, finally, from insider or employee theft. (Tr. at 753-755.)

In an effort to determine the cause of the inventory shortages at Khan's stores, 7-Eleven installed a secret camera at the Atlantic Avenue store which recorded sales transactions for a period beginning in June 2010. (Tr. at 323, 460.) 7-Eleven also attempted to conduct "secret shops" and physically surveilled the store in an effort to determine how the shortages were occurring. (Tr. at 409-410.) Despite these efforts, at that time, 7-Eleven was unprepared to draw specific conclusions about the cause of the inventory losses. (Tr. at 54.)

It was not until 2011, with the introduction of the Secure software system, that 7-Eleven was given the tools it needed to conduct a more in-depth analysis of the Khans' store sales. (Tr. at 327-238.) At about the same time, however, in June 2011, the U.S. Attorney's Office was investigating several 7-Eleven franchises, including all of the Khan stores. (Tr. at 54.) 7-Eleven received notice of this investigation when the U.S. Attorney's Office served it with a subpoena

calling for the records of a number of franchises, including the Khan stores. (Tr. at 55-58.) Financial information for the Khans was also specifically sought by one of the Grand Jury subpoenas served on 7-Eleven. In order not to interfere with this criminal investigation, 7-Eleven curtailed its own investigation of the Khans' franchises and resolved not to initiate any legal action until the criminal investigation concluded. (Tr. at 54-58.)

However, 7- Eleven continued to compile data analyzing the Khans' inventory shortfalls. (Tr. at 58.) The U.S. Attorney's Office served several Grand Jury subpoenas on 7-Eleven in connection with the criminal investigation, with the last Grand Jury subpoena issued on June 14 made returnable on June 21, 2013. (Tr. at 55-67.) This last subpoena called for the production of store video recordings at specified franchise locations, including all of Khans' stores. (Tr. at 66-67.)

On June 17, 2013, several 7-Eleven franchisees, but not the Khans, were arrested. (Tr. at 67-68.) Four days later, on June 21, 2013, 7-Eleven formally served Tariq and Senita Khan with a Non-Curable Notice of Material Breach and Termination and a Notice of Discontinuance of Financing. (Tr. at 83-85.) The breaches set forth in the Notice included, among other things, misuse of the CAV and PLU keys, misreporting and non-reporting of merchandise sales, failed "secret shops," and under-reporting of cash purchases from vendors. The notice further indicated that fraudulent transactions had been observed on the 2010 video. The franchise agreements were terminated immediately without any notice or opportunity to cure.

Judge Lindsay conducted a six-day hearing on the preliminary injunction from July 22, 2013 through July 25, 2013 and on August 7, 2013 and August 8, 2013.

F.  7-Eleven's Case

Brian Padgett, 7-Eleven's Senior Director-Store Accountant, prepared an investigatory report for the years ending 2010 through May 2013, which analyzed the difference between the inventory shortages reported at each of the Khans' stores and franchisee market averages.  The analysis revealed that the Brooklyn Avenue store, the Atlantic Avenue store, the Merrick Road store, the Hempstead Turnpike store, and the Sunrise Highway store experienced inventory shortages, at retail value, for this time period totaling $280,939.68, $286,087.76, $275,561.58, $334,897.87 and $196,928.28, respectively.  These shortages were 407% to as high as 762% higher than market average for 7-Eleven franchises. (Tr. at 702.)

In January 2013, 7-Eleven retained Art Lazo, Director of Loss Prevention at Asset Protection Associates. (Tr. at 369.)  Lazo conducted "secret shops" of  the Khans' stores. (Tr. at 409.)  Shoppers were sent into each of the stores to purchase items and videotape the transactions. (Tr. at 410.)  Afterwards, 7-Eleven would examine the store's POS data to determine if the sale was properly recorded. (Tr. at 411.)  Clips of the secret shop footage were shown during the hearing. (Tr. at 414-430.)  In each instance, although money and goods changed hands, high ticket items, such as beer and cigarettes, were not recorded as sales.  The clips showed different employees engaging in the same type of fraudulent activity.  In one clip, Senita Khan herself fails to record the sale of a phone card through the POS system. (Tr. at 429-430.)

Lazo also supervised the review of the 2010 secret video of the Atlantic Avenue store. (Tr. at 411.)  Six videoclips were shown during the hearing, which were representative of the fraudulent transactions observed on the 2010 tape. (Tr. at 456-467.)  The clips showed different

13

employees failing to properly record the sale of purchased items on the POS system. They either faked a sale by using the CAV key or simply failed to use any key to ring up an item.

As part of the investigation, Lazo also chose 45 random hours of the secret video of which only 39 hours proved viewable. (Tr. at 427, 532, 573-74.) Reviewers compared the transactions captured on the video with a digital image of the receipt generated through Secure and found over 6% of transactions were fraudulent. (Tr. at 529-30.) Lazo then isolated the use of the high fraud risk CAV key from June 2010 to August 2010. Lazo testified that of the 273 CAV transactions analyzed in those three months, 233 were found to be fraudulent. (Tr. at 407.)

Lazo also investigated the Khan's payroll practices, comparing the amount of hours that were logged in by the five stores to what was actually paid out. (Tr. at 477-78.) Using the number of hours typically required to run a corporate store with similar volume as a comparator, Lazo determined that the Khans were reporting fewer hours than were needed to operate the stores twenty-four hours a day. (Tr. at 478-83.)

For instance, during the week of February 22, 2013, the Atlantic Avenue store and the Sunrise Highway store reported 129 and 126 hours, respectively, although it requires a minimum of 168 hours a week to keep the store open twenty-four hours a day with one employee. (Tr. at 480.) In other instances, the Sunrise Highway store reported 86 hours during the week of March 15, 2013 and 74 hours during the week of March 22, 2013. Lazo also found discrepancies in the employees' time cards. For example, Imran Khan was clocked-in at two different stores at the same time. (Tr. at 485-86.)

In response to the Grand Jury subpoena issued on June 14, 2013, 7-Eleven was able to obtain a copy of the DVR recording of sales activity at the Brooklyn Avenue store from June 22,

2012 to approximately November 1, 2012. (Tr. at 68-69.)  The video security system in use at the

Brooklyn Avenue store had four security cameras, two focused on the registers, one on the sales

floor and one on the front door, and recorded approximately 90 days before it overwrote itself.

(Tr. at 70-71, 75, 79.)

After obtaining a copy of the Brooklyn Avenue store video, James Passarella, the Director

of Asset Protection, working with a team of employees, reviewed approximately 1200 hours of

the video. (Tr. at 234-46.)  Passarella testified that he and his team observed hundreds of

fraudulent transactions.

At the hearing, Judge Lindsay was shown video clips from June 22, June 26, June 27,

July 4, July 10, July 18, September 9, September 14, and September 19, 2012.  Passarella

testified that the examples shown during the hearing represented the type of activity seen

throughout the video. (Tr. at 128-32, 231-33.)  The clips clearly revealed that multiple store

employees were bypassing the POS system to avoid recording sales transactions.  Using the

Secure system, the examiners matched the video clips with the register receipts to conclusively

prove fraud. (Tr. at 138-140.)

Passarella testified that the fraud observed on this Brooklyn Avenue store video occurred

primarily through the misuse of the CAV key in connection with the purchase of cigarettes and

beer, both high ticket items.  In a few instances, an item was scanned and subsequently a "no sale

key" was used to open the register and make change for a customer without recording a sale.  In

other instances, the CAV key was used in conjunction with a "hot key," or a shortcut key set up

on the POS system to ring items such as a coffee or a donut.  Using both keys made it appear as

though both items were rung when in fact only the sale of the donut would be recorded on the

POS system. (Tr. at 186-187.)

The employees were also seen making cash sales without recording the sale at all. In each instance, customers are shown handing over cash, receiving change, and leaving with their items. Significantly, the store employee in every instance placed the cash, not in their pocket, but in the cash register drawer or on occasion an alternate white drawer which was shown to be used by Tariq Khan. Depositing the proceeds of these unrecorded sales transactions into the register drawer should have created a noticeable cash overage when the cash was reconciled at the end of each day. (Tr. at 669.)

Passerella also prepared a POS Fraud Analytics Report for November 4, 2012 to February 2, 2013, analyzing the frequency with which Khan's stores made use of 16 transaction types most commonly used to commit fraud. His findings reflected that the Khans' stores ranked 4th, 5th, 7th, 13th, and 19th within the North Atlantic zone, constituting approximately 750 stores, for the most usage of these high fraud risk transactions. Using this same analysis, Passerella was able to rank the Khans' store usage of the CAV and PLU keys; the POS register keys most commonly associated with fraud. Passarella found that the Khans' stores ranked 1st, 3rd, 4th, 5th, and 8th for CAV usage and 1st, 2nd, 3rd, 5th and 20th for PLU usage. In one example, Passerella described that while the zone average for use of the CAV key was 207 times in a 90 day period, the Merrick Road store used the CAV key 1,688 times in the same period. (Tr. at 262-63.)

Notably, Tariq Khan had access to the video security system at the Brooklyn Avenue store and could, if he chose to, have viewed this very same video at any time to discover what was going on in his store. (Tr. at 70-77, 623.) Tariq Khan was clearly made aware that he had a

serious problem with inventory shortages. From at least 2010 to 2013, Tariq Khan was advised on a quarterly basis both, orally and by written report, that all of his stores were experiencing inventory shortages well beyond the norm. Normal inventory shortages for 7-Eleven stores in Khans' market zone varied slightly by year but were nowhere near the shortages at the Khans' stores.

Audit results of actual inventory shortages for all stores within the Khans' market zone indicated that for the years 2010 to May 2013, the total cost value for all inventory losses for all stores within the zone was $38,870 for this 3 ½ year period. By comparison, during this same 3 ½ year period, the Brooklyn Avenue store had shortages of $278,013, the Atlantic Avenue store had $289,900 in losses, the Merrick Road store lost $268,665, the Hempstead Turnpike store had $331,005 in losses, and the Sunrise Highway store had shortages of $195,220.

Despite these significant shortages, which Tariq Kahn claimed to be responsible for 85% out of pocket, there is no indication that either he, or his wife Senita, ever reviewed any store's video to determine the cause of the shortages. Tariq Khan acknowledged that he also had his own DVR systems in the Atlantic Avenue store, Merrick Road Store, and the Hempstead Turnpike store. Yet, he repeatedly rejected offers by 7-Eleven to install updated video security systems in his stores to discover the cause of those losses. (Tr. at 77-79.) Passarella testified that out of 9,000 7-Eleven stores, all but 11 stores had video security systems supported by 7-Eleven. (Tr. at 76-79, 322.) Four of those eleven stores were owned by the Khans.

Eric Merkle and Lei Chen who were Khan's field consultants and assigned the responsibility of reviewing the audit reports with Tariq Khan testified that Khan "never really got too upset" over his inventory losses. (Tr. at 607.) He rejected advice he was given on steps that

17

might be taken to prevent losses, and even refused to permit any store audits in the third quarter of 2011. (Tr. at 614-18, 695-96.)  Instead, he insisted his employees were honest and that 7-Eleven was simply engaged in an accounting conspiracy to oust him as a franchisee because of his vocal opposition to 7-Eleven management practices. (Tr. at 608-12, 1338-39.)

7-Eleven's investigation disclosed that the patterns of fraudulent transactions involving the same methodology and the same types of products, were occurring across multiple shifts, and involved varied employees in all of the Khans' stores. (Tr. at 223, 334, 543.)  Based on his twenty-five years of experience as a loss prevention expert,  Passarella concluded that this could only have occured on such a wide scale at the behest of the stores owners - the Khans. (Tr. at 334-22.)

Through Padgett, 7-Eleven also presented evidence that the Khans' gain would have been approximately $157,500 in just one year.  Factoring in tax write-offs from inventory shortages that would have produced an additional fraudulent tax savings of approximately $161,000, making the Khans' gain $318,500.  (Tr. at 1367.)  Padgett's analysis began by establishing a fraud factor based on the percentage of fraudulent transaction actually observed on the 2010 and 2012 videos. (Tr. at 1360.)  Although that percentage averaged 15.1 percent, to be conservative, Padgett used 10% as his fraud factor.  Padgett then calculated the gross revenues for the five stores per year, which amounted to approximately $9.6 million.  Again, to be conservative, Padgett assumed revenues of $9 million and established that but for the fraudulent transactions, Khans sales would have amounted to $9.9 million.  Padgett then multiplied the unreported sales of $900,000 times 35%, which was 3% less then Khans actual profit margin, arriving at an unreported gross profit figure of $315,000. (Tr. at 1365-66.)  7-Eleven should have received

18

$157,500 of this sum.  (Tr. at 1366.)  Moreover, Khan was able to take a tax write-off for the inventory shortages, which, by way of example, were reported to be $460,000 in 2011. (Tr. at 1367.)  Applying Khans actual tax rate of 35%, Padgett determined that Khans' fraudulent tax saving for this single year amounted to $161,000.  (Tr. at 1367.)

G.  Khans' Testimony

Imran Khan testified at the hearing.  He has an Associate's Degree from Nassau Community College. (Tr. at 809.)  He testified that he has worked in his father's stores since he was a child. (Tr. at 809.) Starting in 2011, he was working approximately 80-90 hours a week. (Tr. at 809-10.)  Although Imran Khan would weekly visit the other stores, he took over the daily management of the Brooklyn Avenue from the fall of 2011 until approximately November 2012. (Tr. at 801-02.)

Imran Khan conceded that he was asked to focus on the Brooklyn Avenue store because the inventory shortages at the store had reached "unheard of levels." (Tr. at 802.)  To remedy this problem, Imran Khan took over the management of the cash and oversaw the employees and inventory. (Tr. at 802.)  Imran Khan described that it was his responsibility as store manager to reconcile the cash at the Brooklyn Avenue store, which was also the responsibility of the store managers at the other stores. (Tr. at 811-813.)  The process he described, which was used at all of Khan's stores, was that during the day, the sales associates would remove cash from the register and deposit the cash into a store safe through a slot. (Tr. at 815, 818.)  Only the store managers, as well as Mr. and Mrs. Khan, had access to the safe. (Tr. at 818.)  At the end of each day, or the following morning, each store manager would pull the POS sales tape and check the tape against the deposited cash. (Tr. at 815.)

19

Imran Khan testified that his parents did not reconcile the cash except when a store manager became unavailable. (Tr. at 814-15.)  He indicated that his father only reviewed the exact amount deposited in the bank and also oversaw sales levels. (Tr. at 814-16.)

Imran Khan testified that, despite spending 80-90 hours per week at the stores, he never once observed a fraudulent transaction. (Tr. at 803, 824.)  He claimed to have never heard of a CAV register key notwithstanding that he had worked at 7- Eleven stores since the age of 9 and one of his responsibilities was to update the POS computer system to recognize new merchandise. (Tr. at 828; 846-47, 849.)  He indicated that because of the positioning of the register, it would always appear to him as though items were being rung up correctly. (Tr. at 847.)  He did not suspect that fraud was widespread and would only occasionally review the store video if he suspected a specific transaction. (Tr. at 847-849.)  Imran Khan never once observed fraudulent activity on the video. (Tr. at 803, 823-824.)

Despite the fact that Imran Khan did not discover any fraudulent activity and did not make changes to store personnel, he was nonetheless able to dramatically reduce the reported inventory shortages in his store for the year 2012. (Tr. at 813-14, 19.)  Apparently he was able to achieve this result without discovering any specific cause for the shortages.  In 2011, the shortages in the Brooklyn Avenue store for the first and second quarters of year 2011 were $46,522 and $63,873.  The last quarter audit revealed a shortage of  72,573.  In 2012, Imran Khan reduced these shortages by over two-thirds to $15,770 in the first quarter; $19,512 and $9,351in the second and third quarters and $3,954 in the last quarter of 2012.   Imran Khan provided no explanation for how he managed such dramatic reductions without finding any evidence of fraud on the part of his employees. (Tr. at 802-03.)

A similar pattern of reductions was achieved in Kahn's other stores for the year 2012, again without any material change in store personnel or discovery of any concerted fraudulent activity. In fact, it was not until 7-Eleven filed its complaint that Tariq and Imran Kahn first came to realize that a number of employees were supposedly engaged in fraud and were thereafter let go. (Tr. at 852-853.)

Imran Khan also attempted to explain the payroll transactions. Specifically, he explained that the Khans viewed the five stores as one business so while the payroll records may reflect too few hours at one store, employees were always being transferred from one store to another to cover the workload. (Tr. at 804-05.) With respect to his own payroll records, which reflected that he had worked more that 24 hours in a day, Imran Khan testified that the hours were entered incorrectly by his mother. (Tr. at 807-08, 836-38.)

Tariq Khan also testified. He indicated that he came to the United States in 1972. (Tr. at 854.) He has a Bachelor's degrees in political science and history. (Tr. at 900.) When he first arrived in the United States, Tariq Khan worked at a Mobil station pumping gas. (Tr. at 855.) He was subsequently employed at Mutual of New York, Metropolitan Life Insurance, and American Creditors Bureau. (Tr. at 855.) He was also employed at Stern & Peshkin, P.C., where he was responsible for determining if a client had assets before the law firm would agree to commence litigation on that client's behalf. (Tr. at 855.)

In 1980 or 1981, Tariq Khan bought a luncheonette in Brooklyn. (Tr. at 856.) Tariq Khan then purchased a stationery store, a delicatessen, a video store, and three gas stations. (Tr. at 856.) As previously stated, he bought his first 7-Eleven franchise in 1988 and subsequently bought four additional stores. (Tr. at 856, 859-61.) Most recently, Tariq Khan purchased the

Middle Bay Country Club. (Tr. at 871.) Tariq Khan sits on numerous boards and has been an officer of UFOLI, the United Franchise Owners of Long Island, and Chairman of the National Coalition, a national organization for 7-Eleven franchisees. (Tr. at 865-68.) Tariq Khan has won numerous awards for his achievements as a franchise owner and was clearly a knowledgeable businessman. (Tr. at 864.)

Tariq Khan acknowledged being aware of the inventory problem. In fact, he testified that he was very concerned about "shrinkage" because, as noted, he calculated the cost to him would be 85% of the value of those losses. (Tr. at 904, 1080-81.) Tariq Khan considered anything over $15,000 per year to be a large shortage. (Tr. at 905.) According to Tariq Khan, every time he met with his field consultants, Erik Merkle and Lei Chen, he would inquire as to the reason for the shortages and would often review reports that they printed from the store's ISP such as the 48As and S1s. (Tr. at 681, 888, 1005-06.)

He claimed that Erik Merkle's reports of their meetings, which were introduced into evidence, describing his refusal to address inventory shortages were inaccurate and primarily made up. (Tr. at 937-38, 45.) He testified that he asked Padgett to come to New York to address what he perceived to be an inventory audit problem, but that Padgett refused. (Tr. at 884, 1374-75.) Padgett denied that Tariq Khan ever sought his assistance in this respect. (Tr. at 1374-75.)

Tariq Khan testified that from approximately 2010, he implemented one specific inventory control in all of his stores. (Tr. at 910.) He required his employees to perform an inventory count of cigarette packs at the end of each shift. (Tr. at 909-910.) Tariq Khan specifically focused on cigarettes to control shortages because he recognized they were high value items and according to him were "like cash." (Tr. at 909.) He described that he even fired

one manager, Mohammed Watoo, because he failed to implement that policy. (Tr. at 908-909.)

Regarding the alleged fraudulent transactions, Tariq Khan testified that neither he nor anyone under his supervision ever instructed his employees to use the CAV or PLU key to under-report sales. (Tr. at 889-890.)  In fact, Tariq Khan testified that he never knew the term CAV or PLU until the trial. (Tr. at 846-47, 888.)  Tariq stated that he knew how to use the register system "a little bit" and could use the ISP computer support system in the stores to look at payroll and merchandise movement. (Tr. at 887.)  However, he never knew how to use the ISP to access monthly statistics of POS key transactions. (Tr. at 888.)

Tariq Khan testified about the video showing him removing cash from the white drawer under the register as a sale was being improperly rung up next to him. (Tr. at 891-92.)  Tariq Khan testified that the white drawer is used for invoices from vendors, $200 worth of quarters, checks, notes, EZ Widers, Bamboo single cigars, and a box of pennies. (Tr. at 890.)

Tariq Khan stated that he was in the store to get a cup of tea and look for the invoices and write checks. (Tr. at 891-92.)  He testified that he never had any interaction with the clerk while the sale was being improperly rung.  Tariq Khan also stated that after watching the videos shown during the hearing, he fired a few employees and was considering a few more "at the end of the day." (Tr. at 897.)

Finally, Tariq Khan testified that he never had any problems with 7-Eleven until he had a dispute with Joe DePinto, President and CEO of 7-Eleven, over a Super Bowl football his son had sold on e-bay and had demanded mediation in the State of California to challenge 7-Eleven's intended placement of the new Clickit security systems in franchises because the Click-it system enabled 7-Eleven to operate the system remotely from their corporate offices without a

franchisee's consent. (Tr. at 875, 895.)

Jeffrey Feldman, a partner at Pinacle 5, a loss prevention company, located in Eureka Springs Arkansas, also testified on the Khans' behalf. (Tr. at 1095.) Feldman worked his way up through 7-Eleven from 1975 to 2002, holding numerous positions including Field Consultant, Sales Manager, Assistant District Manager, Assistant Division Loss Manager, and lastly Manager of the Division of Loss Prevention. (Tr. at 1104.) As part of his duties, Feldman was responsible for investigating inventory shortages, fraudulent transactions, and other aspects of loss prevention. (Tr. at 1112-14.)

Feldman testified that when he was a field consultant, one of his most important jobs was to investigate shrinkage. (Tr. at 1106-1107.) Feldman also testified that, in his experience, inventory losses typically occurred because of employee theft, vendor theft, shoplifting, administrative error, or "flash mob theft." (Tr. at 1121-1122.) He indicated that when he had suspected a franchisee of fraud, he would investigate their gross profit percentages. (Tr. at 1198-1199.)

Feldman discussed how difficult it was determine the source of shortages before 7-Eleven was "lucky enough" to acquire Secure. (Tr. at 1118-19.) He testified that investigators were required to go to the stores and pull POS key reports from the store's ISP, sort the reports by hand, and enter the POS key data into their computers. He stated the process would take several days and ultimately an investigator could create his own reports.

Feldman testified that he reviewed the clips of the fraudulent transactions introduced by 7-Eleven and he was familiar with the manner in which employees were misreporting the sales. (Tr. at 1125-1126.) He also testified regarding a handful of clips, which showed employees

"grazing," that is drinking a store beverage without paying, or in one case removing items in a shopping bag. He showed several clips of employees handling money in a back room which he concluded were at least suspicious if not theft. (Tr. at 1134-38.)

Feldman prepared a spreadsheet reflecting the inventory losses at Tariq Khan's five stores. (Tr. at 1143.) He testified that, by subtracting out the average inventory losses suffered by other stores in the zone and applying a variable inventory percentage (VIP), he was able to determine that Tariq Khan's profit on the inventory losses would have amounted to $695 per month per store. (Tr. at 1310-11.) Feldman opined it would be illogical to conclude that Tariq Khan would have engaged in fraud for $695 per month, per store, and risk losing $428,000 in total net income. (Tr. at 1154-1155.)

Feldman also testified that he reviewed the reports prepared by Lazo and Passarella analyzing the CAV transactions for the Atlantic Avenue store in 2010 and the Brooklyn Avenue store in 2012. With respect to Lazo's review of the 2010 CAV transactions, Feldman agreed that in each instance, the sale of beer or cigarettes was unreported. Feldman indicated that employees often utilized the CAV key and recorded only the sale of a low-priced items like coffee. Feldman opined that it was illogical to conclude that a franchisee would engage in this type of misreporting because the profit margins on lower-priced items are so much higher. (Tr. at 1212-1232, 1245.) In short, Feldman opined that if a franchisee were to steal from his own store, he would do so by not reporting the sale of Slurpees, not cigarettes or beer, because the profit margin in Slurpees is higher. (Tr. at 1231, 1242-43.)

Feldman prepared a chart monetizing the alleged benefit to the franchisees of the fraudulent transactions for August 1-10, 2010, which he indicated was representative of the

benefit of the fraud over the three month period analyzed by Lazo. (Tr. at 1212-1232.) Feldman opined that the monetary benefit to the Khans resulting from the practice was $58.65. (Tr. at 1226.) He compared that benefit to the total retail cost of items rung through the register, which Feldman identified as the theft potential for their employees.

Feldman also prepared a chart monetizing the benefit of the fraudulent transactions from August 1-12, 2012, twelve of the days Passarella had reviewed. (Tr. at 1227-28.) Feldman determined that the benefit to the Khans was $53.09 over a twelve day period, but the theft potential for employees was $418.09. Feldman concluded that the Khan's employees had more to gain from the misreported transactions and were, therefore, likely to be acting alone. (Tr. at 1227-1231.)

### III. CONCLUSIONS OF LAW

A party seeking a preliminary injunction must show "(1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." Covino, 967 F.2d at 77; see also Citigroup Global Mkts., Inc. v. Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010). Preliminary injunctions are "extraordinary remed[ies] that should not be granted as a routine matter." JSG Training Corp. v. Tray–Wrap. Inc., 917 F.2d 75, 80 (2d Cir. 1990); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

7-Eleven requests a preliminary injunction in light of its breach of contract and Lanham Act claims. By remaining in the store after the franchise agreements were terminated, 7–Eleven

maintains that the franchisee-Khans continue to use 7–Eleven trademarks, trade dress, and trade names in a manner likely to cause confusion among consumers. However, in order to establish a claim of breach of contract and trademark infringement, 7–Eleven must first show that the franchise agreements were properly terminated. See 7-Eleven v. Upadhyaya , 2013 WL 765661 (E.D. Pa. March 1, 2013). In other words, if the agreements were not properly terminated, the Khans retain authorization to use 7–Eleven's trademarks and other designations, and no claim for trademark infringement can lie. The Khans assert that the agreements were not properly terminated because they were entitled to notice and opportunity to cure their alleged breaches. To show that it properly terminated the agreements, 7–Eleven must thus demonstrate that such notice was not required.

A. Notice and Opportunity to Cure

Under New York law, the law governing this case, a contract may be terminated without notice and opportunity to cure where there is sufficient evidence of fraud, even where contractual provisions require such notice. See Southland v. Froelich, 41 F. Supp 2d 227, 247 (E.D.N.Y. 1999). "Courts in this district have held that the reason a party is entitled to rescind an agreement despite the cure provision is found in the common law principle that holds that a material breach that goes to the root of the matter or the essence of the contract constitutes a ground for rescission without opportunity to cure." Southland, 41 F. Supp 2d at 246; see also Sea Tow Services, Int'l v. Pontin, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009) (same). This principle would apply to the facts presented here if 7-Eleven is successful in proving the alleged fraud.

Under New York law, a party seeking to establish fraud must show that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant

intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and

was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance

plaintiff sustained pecuniary loss." Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488 (2007);

see Stephenson v. PricewaterhouseCoopers, LLP, 482 Fed. Appx. 618, 622 (2d Cir. 2012)

(same); see also Robinson v. H&R Block Bank, FSB, No. 12-Civ.-4196 (SMG), 2013 WL

2356106, at *3 (E.D.N.Y. May 29, 2013) (same).

B. Fraud

The Court finds that there is more than sufficient evidence of fraud in this case to warrant

termination of the franchise agreements without notice or opportunity to cure because the fraud

goes directly to "the essence of the contract." Southland, 41 F. Supp. 2d 227, 247. At the

hearing, 7-Eleven presented substantial evidence of the Khans' repeated failure to properly

record sales over a period of years. Pasarella testified in detail regarding the overuse of certain

"high risk" POS transactions, the failure of numerous "secret shops" conducted by 7-Eleven,

videos from inside the store showing rampant misreporting of sales, and significant discrepancies

between reported sales and inventory purchased by the stores.

The Khans insist that 7-Eleven should have been required to satisfy a heightened

probability of success on the merits because 7-Eleven essentially seeks summary judgment on the

"ultimate relief" in this action. Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60

F.3d 27, 34–35 (2nd Cir. 1995). However, the preliminary injunction only will prevent the

Khans from operating the stores during the pendency of this action until a final decision is

reached on the merits. In the Court's view, the granting of a preliminary injunction here is not

the equivalent of granting the "ultimate relief" and, if 7-Eleven does not prevail on the merits, the

stores could be returned to the Khans.  Indeed, in that event, any net income due and owing to the Khans would be accounted for by 7-Eleven.

The Khans further assert that Judge Lindsay erred in relying on "circumstantial evidence" and statistical "assumptions" that failed to tie the Khans directly to any wrongdoing.  Rather, the Khans insist, the "secret shop" evidence in particular established that the Khans were the victims of employee theft.  However, "[t]his Circuit  . . . has unequivocally rejected the view that circumstantial evidence is probatively inferior to direct evidence and that its sufficiency is, therefore, to be determined by a different, more stringent test, than is applied to direct proof." La Torres v. Walker, 216 F. Supp. 2d 157, 168 (S.D.N.Y. 2000)(quoting United States v. Brown, 236 F.2d 403, 405 (2d Cir. 1956)); see also United States v. Sureff, 15 F.3d 225, 228-29 (2d Cir. 1994); United States v. Bowles, 428 F.2d 592, 592 (2d Cir. 1970).

In this case, the Court finds that the evidence, both direct or circumstantial, set forth compelling indications of fraud on the part of the Khans.  For example, using Secure, Passarella analyzed the Khans' Stores usage of the CAV and PLU keys compared to the market average for the time period from January 20, 2013 through July 21, 2013.  Evaluating 107 Stores, the Khans' Stores ranked 1st, 3rd, 4th, 5th, and 8th for CAV usage, and 1st, 2nd, 3rd, 5th, and 20th for PLU usage.  Passarella also prepared a POS Fraud Analytics Report for the period from November 4, 2012 to February 2, 2013, which analyzed the frequency with which Khans' Stores made use of 16 transaction types most commonly used to commit fraud.  The report reflects that the Khans' Stores ranked 4th, 5th, 7th, 13th, and 19th in the North Atlantic Zone, comprising approximately 750 stores, for the highest usage of the high-fraud risk transactions.

 In addition, contrary to the Khans' contention, Passarella testified that, in addition to the

analysis of the Brooklyn Avenue store shown during the hearing, a more comprehensive review of the CAV transactions and a random hourly review of a portion of the footage was conducted. (Tr. at 221-223.) A total of 846 CAV transactions were examined, of which 603 or 71% of the transactions were proved fraudulent. (Tr. at 240.) The hourly review, which examined 1,346 transactions, identified 138 instances in which fraud occurred using a POS key and 76 instances of non-POS fraud. (Tr. at 249.) Thus, approximately 15.1% of the transactions examined were identified as fraudulent.

The Khans also challenge Judge Lindsay's reliance on inventory shortages as a basis to infer fraud. While, as the Khans observe, an inventory shortage does not by itself constitute a breach of a specific term of the franchise agreements, the pattern of inventory shortages here, coupled with misreporting of sales and video tape evidence, are indicative of fraud as to the franchise agreements as a whole. It bears mentioning that the inventory shortages at the Khans' stores were from 407% to as high as 762% higher than market average for 7-Eleven franchises.

The Khans note that Pasarella admitted on cross-examination that in 2011, insufficient evidence existed regarding the inventory shortages to take legal action against the Khans. However, the Court finds that 7-Eleven was not able to determine the cause of the shortages until they purchased the Secure software in 2011 and could compare the video footage with POS key data reports and transaction journals.

The Khans also insist that Imran Khan similarly lacked the tools needed to prevent employee theft and therefore Judge Lindsay should not have discredited him for his failure to do so. The Court disagrees. First, Judge Lindsay found that the fraudulent transactions resulted from direction by the Khans, not from low-level employee theft. Second, Judge Lindsay found

Imran's testimony not credible because his claim that (1) he was unaware of what his employees were doing because he apparently was never behind the counter at a time when these sales were being improperly rung and (2) that he did not even know what a CAV key was until the hearing "defie[d] the realities of his employment in his father's stores." (Tr. at 1436.) The Court sees no basis to disturb Judge Lindsay's well-supported credibility determinations.

The Khans further insist that, contrary to Judge Lindsay's determinations, they were deeply concerned about the inventory shortages because such shortages required Tariq Khan to reimburse 7-Eleven for the cost of the missing inventory. (Tr. At 758-63.) The Khans take issue with the fact that Judge Lindsay used against them the reduction in inventory shortages under Imran Khan's management inasmuch as she inferred that the only logical explanation for those reductions was that Khans orchestrated the initial shortages. According to the Khans, they acted independently to address the inventory shortages, and the more logical conclusion from this evidence is that employee theft decreased as Imran Khan was present on more occasions in the stores. The Court disagrees.

As Judge Lindsay noted, "the fact that Imran Khan efficiently curtailed the inventory shortages in 2012 as 7-Eleven's scrutiny of the Khans' stores increased supports the conclusion that the shortages were orchestrated by the Khans. Without changing personnel, finding any fraud, or even knowing what to look for, Imran Khan managed to cut shortages by over two thirds. This reduction could have only been accomplished if the rate of inventory shortages were governed at the top." (Tr. at 1438.)

Furthermore, the Khans make much of the fact that, according to Feldman, the Khans had little financial incentive to engage in the alleged fraudulent transactions. However, the Court

finds persuasive Judge Lindsay's reasoning challenging Feldman's statistical assumptions. As Judge Lindsay found, Feldman's analysis was flawed in that it overlooks Khans' actual profit margin and appears to apply a profit margin of only 22%. Feldman also adjusted the sales figures by applying a VIP. Adjusting the value of the sales by applying a low profit margin and then applying a VIP effectively distorts and reduces the value of the sales. Feldman's monetization of the inventory losses also ignored, among other things, the value that might have been gained from the tax right off on the loss.

Feldman's comparison of profit margins was also misleading. Feldman's concluded that it would be smarter for the owner of a store to steal an item with a 90% profit margin rather than a 10% profit margin. As demonstrated by 7-Eleven, profit margins do not accurately measure the benefits derived from theft. Thus, even assuming a $1 slurpee had a 90% profit margin and a $9 pack of cigarettes had a 10% profit margin, the profit would be the same. Feldman also ignored other considerations related to theft, such as the ease with which an item can be stolen.

Feldman's analysis, rather than being unchalleged as the Khans suggest, was directly discredited by 7-Eleven through the testimony of Padgett. Taking into consideration tax writeoff savings and conservative estimates of profit margins and revenues, Padgett convincingly concluded that the gain to the Khans from their fraudulent activities was approximately $318,500 per year.

It also bears emphasis that the Khans failed to make any objections with respect to the Judge Lindsay's findings regarding their suspicious payroll practices. As noted above, Lazo determined that the Khans were reporting fewer hours than were needed to operate the stores twenty-four hours a day.

In sum, the Court concludes that 7-Eleven has established that it is substantially likely to succeed in proving the elements of fraud and that the Khans' fraudulent actions go to the "root of the matter or essence of the contract." <u>Wisser Co. v. Mobil Oil Corp.</u>, 730 F.2d 54, 59 (2d Cir. 1984). The Khans' actions served to destroy all trust between themselves and 7-Eleven and 7-Eleven has been deprived of its contractual right to receive "the fruits of [its] contract." Consequently, the Court finds that 7-Eleven is likely to succeed on the merits showing that the June 17, 2013 termination of the franchise agreements without any notice or opportunity to cure was proper, and the agreements were terminated as of that date.

For the same reasons, the Court finds that there is a substantial likelihood of success on the merits of 7-Eleven's Lanham Act claim. "A franchisee's use of the franchisor's marks is unauthorized if the franchisor properly terminated the franchise agreement." <u>Dhaliwal</u>, 2012 WL 5880462, at *5. The Court having concluded that the Agreement in this case was terminated properly, the Khans's use of 7–Eleven's trademarks is unauthorized and will cause confusion. <u>See Dunkin Donuts v. Tim and Tab Donuts</u>, 2009 US Dist LEXIS 83798 * 23 (EDNY Sept 15, 2009). Accordingly, the Court concludes that there is a substantial likelihood that continued use of the trademarks will cause confusion and, thus,7 Eleven has demonstrated a likelihood of success on the merits on its trademark infringement claim.

C. <u>Irreparable Harm</u>

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." <u>Kamerling v. Massanari</u>, 295 F.3d 206, 214 (2d Cir. 2002). Irreparable harm requires a plaintiff to show "(1) 'he is likely to suffer irreparable injury in the absence of an injunction'; (2) 'remedies at law, such as monetary damages, are inadequate

to compensate for that injury'; (3) the balance of hardships tips in his favor; and (4) 'the public interest would not be disserved by the issuance of a preliminary injunction.'" <u>Rex Med. L.P. v. Angiotech Pharms. (US), Inc.</u>, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010) (quoting <u>Salinger v. Colting</u>, 607 F.3d 68, 74–75 (2d Cir. 2010)).  The alleged injury must be "actual and imminent, not remote or speculative." <u>Kamerling</u>, 295 F.3d at 214.

"As for the adequacy of potential remedies, it is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." <u>Brooklyn Heights Ass'n, Inc. v. National Park Services</u>, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011); <u>Carpenter Technology Corp. v. City of Bridgeport</u>, 180 F.3d 93, 97 (2d Cir. 1999) (condemnation of plaintiff's real property constitutes irreparable injury).

"Given this framework, [7-Eleven has] made a clear showing of irreparable harm meriting preliminary injunctive relief" stemming from the Khans' continued occupancy of the store and interference with 7-Eleven's property rights. <u>Brooklyn Heights Ass'n, Inc.</u>, 777 F. Supp. 2d at 435.  "Irreparable harm in this context flows from the owner's inability to make better use of the site, or the owner's lack of control over features, fixtures, and equipment located on the site." <u>Southland</u>, 41 F. Supp. 2d at 242.

Furthermore, [t]he loss of good will constitutes irreparable harm . . .  [and t]he interruption of the availability of a necessary good can negatively effect the provider's good will even if the interruption is brief." <u>Gulf Oil Ltd. P'ship v. Smerci</u>, CV-12-4731 (SJF)(WDW), 2013 WL 394893 (E.D.N.Y. Jan. 30, 2013)(citation and quotation marks omitted).  As stated in

Dhaliwal: "7–Eleven does not need to show Dhaliwal will take actions through his management of the Rocklin Store that will damage 7–Eleven's goodwill or reputation; regardless of the care that Dhaliwal takes while running the store, 7–Eleven still has the right to maintain control over its trademarks to prevent customer confusion." 2012 WL 5880462, at *7. TGI Friday's Inc. v. Great Nw. Rests., Inc., 652 F. Supp. 2d 763, 772 (N.D. Tex. 2009) ("Courts have held that a franchisor suffers a risk of injury to its reputation and the value of its marks even if the alleged infringer offers superior services.").

The Khans maintain that 7-Eleven's three-year delay in bringing this action militates against a finding of irreparable harm. Indeed, the Khans assert that 7-Eleven should have taken action in 2010 following the results of the operational review of the Merrick Road store. However, the Court agrees with Judge Lindsay that "7-Eleven was not able to determine the cause of the shortages until they purchased the Secure software and could compare the video footage with POS key data reports and transaction journals." (Tr. at 1442.) While Passerella acknowledged that 7-Eleven was not instructed by federal authorities to puts its internal investigation or hold pending the results of the federal investigation, the evidence indicates that 7-Eleven acted in good faith in doing so. In this regard, the Court places much weight on the fact that 7-Eleven terminated the franchise agreements and commenced this action a mere four days after the arrest of several 7-Eleven franchisees.

## IV. FINAL CONCLUSIONS AS TO THE MOTIONS FOR PRELIMINARY INJUNCTIONS

For the foregoing reasons, the Court adopts Judge Lindsay's recommendation in its entirety and adopts Judge Lindsay's recommendation that 7-Eleven's motion for a preliminary

injunction be granted. The Court directs the Khans (1) to surrender the subject stores to 7-Eleven within 3 days of the date of this order; (2) to preserve all security surveillance images located at the stores; (3) to allow 7-Eleven to copy all such images recorded within the stores, at any and all times, including all images stored and/or recorded on any type of analog or digital media such as DVRs; and (4) to make the DVRs available to 7-Eleven for purposes of conducting a forensic review to attempt to recover any erased surveillance images.

Finally, given the Court's determination with respect to the propriety of the termination of the franchise agreements, the Court adopts Judge Lindsay's recommendation that the Khans' motion for injunctive relief be denied in all respects.

The $50,000 bond filed by 7-Eleven related to the temporary restraining order shall remain in the effect, now as a condition of the preliminary injunction.

**SO ORDERED.**

Dated: Central Islip, New York
October 10, 2013

 /s/ *Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge